ACCEPTED
15-25-00021-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
3/10/2025 4:49 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00021-CV

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/10/2025 4:49:44 PM
CHRISTOPHER A. PRINE
Clerk

_____

PFIZER INC. AND TRIS PHARMA, INC.,

*Petitioners/Defendants*,

*v.*

THE STATE OF TEXAS AND TARIK AHMED,

*Respondents/Plaintiffs.*

_____

On Appeal from the
71st Judicial District Court, Harrison County

_____

## Plaintiffs' Response to Defendants' Petition for Permission to Appeal

_____

| | |
|---|---|
| KEN PAXTON<br>Attorney General of Texas | JONATHAN D. BONILLA<br>Assistant Attorney General |
| BRENT WEBSTER<br>First Assistant Attorney General | JORDAN UNDERHILL<br>Assistant Attorney General |
| RALPH MOLINA<br>Deputy First Assistant Attorney General | VIVIAN EGBU<br>Assistant Attorney General |
| AUSTIN KINGHORN<br>Deputy Attorney General for Civil Litigation | NADIA BURNS<br>Assistant Attorney General |
| AMY SNOW HILTON<br>Chief, Healthcare Program Enforcement<br>Division | Office of the Attorney General<br>Healthcare Program Enforcement Division<br>P.O. Box 12548, Capitol Station 056<br>Austin, Texas 78711-2548<br>*Counsel for the State of Texas* |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................i

INDEX OF AUTHORITIES.........................................................ii

ISSUE PRESENTED CORRECTED ..............................................1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................1

SUMMARY OF THE ARGUMENT ..................................................4

STANDARD OF REVIEW ...........................................................5

ARGUMENT.......................................................................9

I.      To Permit this Appeal to Proceed, this Court Must Address a Threshold
        Jurisdictional Issue................................................................9

II.     This Appeal Does Not Present a Controlling Question of Law as to Which
        There is a Substantial Ground for Difference of Opinion. ..........................10

        A.      Defendants Misrepresent Plaintiffs' Position to Make This
                Disagreement Appear Legitimate......................................10

        B.      The Issue Raised by Defendants is Neither Novel nor Difficult and
                Does Not Require the Immediate Intervention of this Court.............12

III.    An Immediate Appeal Would Not Materially Advance the Ultimate
        Termination of the Litigation....................................................19

CONCLUSION....................................................................21

CERTIFICATE OF COMPLIANCE ................................................23

CERTIFICATE OF SERVICE .......................................................24

# INDEX OF AUTHORITIES

**Cases**                                                                 **Page**

*City of Houston v. Houston Professional Fire Fighters' Association, Local 341,* 626 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2021) ..............................................18

*CMH Homes v. Perez*, 340 S.W.3d 444 (Tex. 2011) .................................................10

*Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384 (Tex. 2014)..............15

*Gulf Coast Asphalt Co., L.L.C. v. Lloyd*, 457 S.W.3d 539 (Tex. App.—Houston [14th Dist.] 2015, no pet.) .................................................................................10

*In re Xerox Corp.,* 555 S.W.3d 518 (Tex. 2018) ................................................16, 18

*Indus. Specialists, LLC v. Blanchard Ref. Co. LLC*, 652 S.W.3d 11 (Tex. 2022) .......... ................................................................................................................ 7, 8, 9

*Kennedy v. Andover Place Apartments*, 203 S.W.3d 495 (Tex. App.—Houston [14th Dist.] 2006, no pet.).........................................................................................9

*Lippincott v. Whisenhunt*, 462 S.W.3d 507 (Tex. 2015) ..................................... 4, 12

*Malouf v. State ex rels. Ellis*, 694 S.W.3d 712 (Tex. 2024) ........................... 15, 16, 18

*Molinet v. Kimbrell*, 356 S.W.3d 407 (Tex. 2011) .................................................. 13

*Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014)........................................................14

*Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725 (Tex. 2019) ......... .................................................................................................................5, 6, 7, 10

*Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53 (Tex. 2019) .......................................12

*State ex rel. NPT Assocs. v. Lab'y Corp. of Am. Holdings*, No. 01-23-00043-CV, 2024 WL 5249087 (Tex. App.—Houston [1st. Dist.] Dec. 31, 2024, no pet. h.) ............. ..................................................................................................................14, 15, 20

*TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432 (Tex. 2011)....................13

**Statutes**

21 U.S. Code § 351(a)(1) ...............................................................1

Tex. Civ. Prac. & Rem. Code § 51.014 .........................................7

Tex. Civ. Prac. & Rem. Code §51.014(d) ..................................8, 9

Tex. Civ. Prac. & Rem. Code § 51.014(f) .................................... 9

Tex. Civ. Prac. & Rem. Code § 51.014(d), (f)............................7, 8

Tex. Const. art. V, § 3-b....................................................... 6

Tex. Health & Safety Code § 431.111(a)(1)(B) ...........................1

Tex. Hum. Res. Code §§ 36.002(1) and (4)(B)......................... 20

Tex. Hum. Res. Code §§ 36.002(1), (2), and (4)(B) .................. 20

Tex. Hum. Res. Code § 36.002(2).................................14, 15, 20

Tex. Hum. Res. Code § 36.002(7) ............................................19

Tex. Hum. Res. Code § 36.002(7)(C)................................ *passim*

Tex. Hum. Res. Code § 36.002(1), (4), and (12) ...................... 13

**Rules**

Tex. R. App. P. 28.3........................................................... 1, 7

Tex. R. App. P. 28.3(a) ...........................................................7

Tex. R. App. P. 28.3(e)(4)........................................................7

Tex. R. App. P. 47................................................................. 9

Tex. R. Civ. P. 168 .................................................................7

**ISSUE PRESENTED CORRECTED**

Whether this court should permit an appeal under Texas Civil Practice & Remedy Code § 51.014(f) and Texas Rule of Appellate Procedure 28.3 when the Defendants cannot demonstrate (1) that this petition involves a controlling question of law as to which there is substantial ground for disagreement; and (2) that an immediate appeal will materially advance the ultimate termination of this litigation.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

On November 8, 2023 the State of Texas and Tarik Ahmed ("Plaintiffs") filed the First Amended Petition in the 71st District Court alleging, among other things, that Pfizer Inc. ("Pfizer") and Tris Pharma, Inc. ("Tris") (collectively, "Defendants")[1] defrauded Texas Medicaid by knowingly manufacturing and distributing an ADHD drug intended for children—Quillivant XR ("QXR")—that was adulterated under both the Federal Food, Drug, & Cosmetics Act ("FDCA")[2] and the Texas Food, Drug, & Cosmetics Act ("TFDCA")[3] during the time period relevant to the lawsuit. *See* Plaintiffs' Second Amended Petition ("SAP") ¶ 2. Plaintiffs brought four causes of action against Pfizer under the Texas Health Care

---

[1] The CEO of Tris, Ketan Mehta, is also a named defendant in this lawsuit. His appeal challenging personal jurisdiction is currently pending on appeal before this Court. *See* 15-24-00021-CV.

[2] 21 U.S. Code § 351(a)(1).

[3] Tex. Health & Safety Code § 431.111(a)(1)(B).

Program Fraud Prevention Act ("THFPA")[4] and one cause of action against Tris. SAP ¶¶ 124-127.

More specifically, Plaintiffs allege that, from at least 2012 to 2018, Tris manipulated the FDA-mandated quality control tests for QXR to secure passing results. *See* SAP ¶ 44. Plaintiffs allege that Tris—responsible for manufacturing QXR—struggled to produce QXR, which routinely failed quality control tests. SAP ¶¶ 49-50. Rather than determine the cause of these failures, Tris manipulated its testing processes to make it easier for QXR to pass. *See generally*, SAP Section VII.B. Additionally, Pfizer—responsible for the distribution and marketing of QXR—knew about the testing failures, manipulation, and patient complaints related to QXR and did nothing to properly investigate and remediate the situation. SAP ¶¶ 64-76. Defendants concealed this manipulation—and the fact that QXR was adulterated as a result—from Texas Medicaid and its predominantly pediatric population, so that they could continue to distribute and profit from sales, without regard for the safety, efficacy, or quality of the adulterated QXR. *See* SAP ¶¶ 46-48, 77-78.

On February 5, 2024, Pfizer filed a Rule 91a Motion to Dismiss. This Motion was joined in its entirety by Tris, which also filed a separate Rule 91a Motion to

---

[4] Tex. Hum. Res. Code Chapter 36 (Formerly called the Texas Medicaid Fraud Prevention Act, or "TMFPA.").

Dismiss. Following Plaintiffs' response and oral argument, Judge Morin denied both Motions to Dismiss.[5] Defendants filed a Joint Motion for Reconsideration or Clarification on July 2, 2024. Following Plaintiffs' response, the Court denied the Motion for Reconsideration on August 12, 2024.

On August 30, 2024, Defendants filed a Joint Motion to Amend Previous Order and Certify for Interlocutory Appeal. This Motion specifically requested that the Court amend its orders denying Pfizer and Tris's Motions to Dismiss to allow appeal on a single issue: whether section 36.002(7)(C) of the THFPA requires Plaintiffs to plead materiality. Following the Plaintiffs' response, the Court denied this Motion on October 10, 2024.[6]

On November 18, 2024, the Court indicated it would, on its own initiative, re-hear Defendants' Joint Motion to Amend via oral argument. Prior to the hearing, Plaintiffs filed their Second Amended Petition on January 17, 2025, to remove a request for injunctive relief against Defendant Pfizer that was unrelated to the present controversy. Following a hearing on January 27, 2025, the Court reversed its October

---

[5] Defendants falsely assert that during this hearing, "the State has repeatedly avoided answering" the question of why the State continued to pay for QXR. Defs. Pet. at 11. Yet Plaintiffs directly addressed this question. *See* Tr. 41:5-21, June 10, 2024 (attached as Appendix Tab A).

[6] Attached as Appendix Tab B.

3

10, 2024 order and granted Defendants' Motions to Amend, allowing Defendants to move forward with their permissive appeal.

## SUMMARY OF THE ARGUMENT

It is black-letter law that "[a] court may not judicially amend a statute by adding words that are not contained in the language of the statute." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam). Yet, this is *precisely* what Defendants asked the trial court to do and what they are now inviting this Court to do. This issue— already readily settled by an extensive line of precedent—does not present a "controlling question of law as to which there is a substantial ground for difference of opinion." *See* Tex. Civ. Prac. & Rem. Code § 51.014(d). As will be explained below, there is *no* room for a difference of opinion on this topic, let alone "substantial ground" for one.

Additionally, this appeal will not materially advance the ultimate termination of this litigation. In addition to the section 36.002(7)(C) claims, Plaintiffs assert claims under sections 36.002(1), (2), and (4)(B) against Pfizer, none of which rely on section 36.002(7)(C) to succeed. Thus, resolving this single question in Pfizer's favor would not substantially shorten or advance the termination of the case.

Indeed, if this Court were to hold that section 36.002(7)(C) requires Plaintiffs to plead materiality, Plaintiffs would, presumably, be given an opportunity to amend

4

their pleadings. Thus, any decision in Defendants' favor would *delay* the case, rather than push it towards resolution.

Considering this is now the *fifth* time that Defendants are litigating an argument initially raised in their Rule 91a Motions to Dismiss, their suggestion that they are concerned with ensuring the efficient resolution of this case rings hollow. Time spent debating a meritless legal theory could instead be invested in resolving this case. Because neither requirement of Tex. Civ. Prac. & Rem. Code § 51.014(d) are met, this Court should deny Defendants' Petition.

Further, because the Amended Orders concern the First Amended Petition, rather than the live pleading, this Court should evaluate whether it has jurisdiction to entertain Defendants' Petition.

## STANDARD OF REVIEW

Generally, "appeals may be taken only from final judgements." *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 730 (Tex. 2019). "Consistency, finality, and judicial economy fix the final judgment rule in our jurisprudence so that appellate courts . . . decide issues on a full record, do not unnecessarily delay the underlying trial, avoid futility, and consider all issues in a single round of review." *Id.* Of course, the Texas Constitution allows for certain exceptions to the final judgment

rule,[7] as does Tex. Civ. Prac. & Rem. Code § 51.014. Under Tex. Civ. Prac. & Rem. Code § 51.014(a), there are several specific instances in which a "person may appeal from an interlocutory order of a district court, county court of law, statutory probate court, or county court." These enumerated instances are frequently referred to as "interlocutory appeals as of right" because the appellant need not seek judicial permission before filing the interlocutory appeal. *See Sabre Travel*, 567 S.W.3d at 730.

In contrast, subsections 51.014(d) and (f) provide for permissive appeals. Texas Civil Practice & Remedies Code § 51.014(d) states:

> On a party's motion or on its own initiative, a trial court in a civil action *may*, by written order, permit an appeal from an order that is not otherwise appealable if:
>
> > (1) the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and
> > (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation.

(Emphasis added). Likewise, section 51.014(f) says that "[a]n appellate court *may* accept an appeal permitted by Subsection (d) . . . ." (emphasis added). The use of the phrases "may . . . permit" in section 51.014(d) and "may accept" in section 51.014(f) indicate that "the Legislature conveyed a discretionary function" to the trial and appellate courts. *Sabre Travel*, 567 S.W.3d at 730.

---

[7] *See*, *e.g.*, Tex. Const. art. V, § 3–b.

The associated rules promulgated by the Texas Supreme Court reflect this discretionary doctrine. *See* Tex R. Civ. P. 168; Tex. R. App. P. 28.3(a). The comments to Texas Rule of Appellate Procedure 28.3 state that "[t]he petition procedure in Rule 28.3 is intended to be similar to the Rule 53 procedure governing petitions for review in the Supreme Court." This means that "the courts of appeals can similarly accept or deny a permissive interlocutory appeal as [the Supreme Court] can a petition for review." *Sabre Travel*, 567 S.W.3d at 731.

In both instances—at the trial and appellate level—a court *may only* permit an appeal if (1) there is a controlling question of law as to which there is a substantial ground for a difference of opinion; and (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation. *See* Tex. Civ. Prac. & Rem. Code § 51.014(d), (f); Tex. R. Civ. P. 168; and Tex. R. App. P. 28.3(e)(4).

"[T]he limits section 51.014 imposes restrict the permitting and accepting— not the denial or refusal—of an interlocutory appeal." *Indus. Specialists, LLC v. Blanchard Ref. Co. LLC*, 652 S.W.3d 11, 16 (Tex. 2022) (plurality op.). This means that "[a] trial court may permit an appeal only 'if' subsection (d)'s two requirements are met, and the court of appeals 'may accept' the appeal only if the application

explains 'why an appeal is warranted under Subsection (d).'" *Id.* (quoting § 51.014(d), (f)).

Indeed, "courts have no discretion to permit or accept an appeal if the two requirements are not satisfied." *Id.* However, even if the two requirements are met, a court of appeals is under no obligation to accept the appeal. As the Supreme Court explicitly acknowledged, "[n]othing in the statute or in our rules implementing the statute can be read to provide that the courts *must* permit and accept an appeal when the requirements are met." *Id.* In this sense, subsections 51.014(d) and (f) grant courts "vast—indeed, unfettered—discretion to accept or permit the appeal." *Id.*

Additionally, a trial court's conclusion that the requirements of section 51.014(d) are met does not constrain the appellate court's discretion. Rather, "[u]nder subsection (f), the trial court's decision to permit the appeal is merely the prerequisite for the court of appeals to exercise its discretion at all. The trial court's conclusion regarding the two requirements has no bearing on the court of appeals' subsequent evaluation of the requirements under subsection (f)." *Id.*

Thus, "section 51.014(f) permits Texas courts of appeals to accept a permissive interlocutory appeal when the two requirements of section 51.014(d) are met, but it grants the courts discretion to reject the appeal even when the requirements are met."

*Id.* at 21. Additionally, Texas Rule of Appellate Procedure 47 "requires the courts to state only their basic reasons for their decision to accept or reject the appeal." *Id.*

## ARGUMENT

In this case, neither requirement of section 51.014(d) is met. This Court should therefore decline to permit Defendants' appeal. First, the controlling question of law in this instance concerns a well-worn area of statutory interpretation. It is neither novel, difficult, nor something of such import that it requires this Court to jump in prior to final judgment. Second, a decision in Defendants' favor on this question would not "collapse"[8] Plaintiffs' case. Rather, a decision by this Court taking up the interlocutory appeal and breaking from precedent by ruling in Defendants' favor would only protract this proceeding.

## I.    To Permit this Appeal to Proceed, this Court Must Address a Threshold Jurisdictional Issue.

Courts of appeal have "a duty to examine [their] own jurisdiction." *Kennedy v. Andover Place Apartments*, 203 S.W.3d 495, 497 (Tex. App.—Houston [14th Dist.] 2006, no pet.). This is especially true when a court is called on to depart from the final judgment rule in the form of an interlocutory appeal, which "must be strictly construed because it is 'a narrow exception to the general rule that interlocutory

---

[8] Defs. Pet. at 24.

orders are not immediately appealable.'" *Sabre Travel*, 567 S.W.3d at 736 (quoting *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011)).

As stated above, Plaintiffs filed their Second Amended Petition on January 17, 2025. The Second Amended Petition removed a request for injunctive relief against Defendant Pfizer. It does not alter the cause of action that this proposed appeal concerns, but because the Amended Orders[9] at issue specifically reference the First Amended Petition, rather than the live pleading, this Court should evaluate whether the Amended Orders must be corrected prior to consideration of this appeal.

## II. This Appeal Does Not Present a Controlling Question of Law as to Which There is a Substantial Ground for Difference of Opinion.

### A. Defendants Misrepresent Plaintiffs' Position to Make This Disagreement Appear Legitimate.

To be eligible for a permissive interlocutory appeal, the order at issue must concern a controlling issue of law with substantial ground for difference of opinion. In interpreting this requirement, courts have noted that the disagreement at issue must be a "legitimate" disagreement. *See Gulf Coast Asphalt Co., L.L.C. v. Lloyd*, 457 S.W.3d 539, 544 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

---

[9] *See* Defs. Appendix A.

In an attempt to manufacture a legitimate disagreement, Defendants repeatedly accuse Plaintiffs of treating the THFPA as a strict-liability statute.[10] This is wrong. Plaintiffs have not, at any point in this proceeding, contended that the THFPA establishes a strict-liability standard.[11] Under Tex. Hum. Res. Code § 36.002(7)(C), a person commits an unlawful act if the person "*knowingly* makes or cause to be made a claim under a health care program for . . . a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate." (Emphasis added). Thus, a cause of action under that section plainly requires that Defendants acted knowingly. The specified provision is not one of strict liability—and neither are any of the other unlawful acts enumerated under section 36.002.

Plaintiffs have accordingly pled that Defendants knowingly caused claims to be made under Texas Medicaid for their adulterated product. SAP ¶ 127. The fact that Defendants insist on painting Plaintiffs' position as one of strict liability evince their efforts to hide the ball, rather than engage honestly with the bare text of section 36.002(7)(C).

This strategy is apparent in Defendants' repeated suggestion that Plaintiffs "failed" to plead materiality for the section 36.002(7)(C) claims. The verb "fail"

---

[10] *See* Defs. Pet. at 15, 16, 18.

[11] Plaintiffs have explained at each stage *why* the THPFA is not a strict liability statute. *See* Tr. 42:17-21, June 10, 2024; Tr. 18:14-19, January 27, 2025 (attached as Appendix Tab C).

presupposes that Plaintiffs had a duty to anticipate Defendants' self-serving and unsupportable interpretation of section 36.002(7)(C) such that Plaintiffs should have pled something that is not required by the plain language of the provision. Plaintiffs had no such duty and did not "fail" to do anything. Rather, Plaintiffs pled precisely what is required by section 36.002(7)(C): that Defendants *knowingly* made or caused to be made claims for an adulterated drug.

### B. The Issue Raised by Defendants is Neither Novel nor Difficult and Does Not Require the Immediate Intervention of this Court.

The issue raised here is so well-settled that it does not provide "substantial grounds for a difference of opinion" and justify the immediate intervention of an appellate court. Rather, it is a straightforward issue of statutory interpretation with an uncontroversial and straightforward answer: "[courts] presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." *Lippincott*, 462 S.W.3d at 709.

This tenet—that courts must leave legislating to the Legislature—is thoroughly enshrined in State law. "In interpreting statutes, [courts] must look to the plain language, construing the text in light of the statute as a whole." *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). When "the statute's plain language is unambiguous, [courts] interpret its plain meaning, presuming that the Legislature intended for each of the statute's words to have a purpose and that the Legislature

12

purposefully omitted words it did not include." *Id.*; *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("[Courts] presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen."); *Molinet v. Kimbrell*, 356 S.W.3d 407, 414–15 (Tex. 2011) ("It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according to the language the Legislature used, absent a context indicating a different meaning or the result of the plain meaning of the language yielding absurd or nonsensical results.").

The THFPA contains a definition of "material."[12] Three of the unlawful acts enumerated under section 36.002 use the word "material."[13] Given that "material" is defined within the THFPA and used within some of the unlawful acts, the omission of this word from other unlawful acts cannot reasonably be seen as anything other than a deliberate legislative choice. If the Legislature intended for section 36.002(7)(C) (or any of the other unlawful acts that do not use the word "material") to require materiality, it was more than capable of saying so.

---

[12] Section 36.001 (5-a), defining material as "having a natural tendency to influence or to be capable of influencing."

[13] *See* Tex. Hum. Res. Code § 36.002(1), (4), and (12).

13

The *LabCorp* case[14] cited by Defendants further elucidates the lack of genuine controversy. *LabCorp* concerned three unlawful act provisions of the THFPA: subsections 36.002(1), (4)(B), and (2). The first two provisions use the word "material," while section 36.002(2) does not. The defendant, Lab. Corp., argued that, despite the absence of the word "material" from the text of section 36.002(2), the court should disregard the plain language of the statute, inserting an element of materiality where the Legislature chose to omit it.

On appeal, the trial court's decision siding with Lab. Corp. was reversed. In doing so, the First Court explained that:

> The word "material" does not appear in the text of section 36.002(2). At the same time, the Legislature included the word "material" in the provisions for three other unlawful acts in section 36.002. Statutory construction requires us to "study the language of the specific provision at issue, within the context of the statute as a whole, endeavoring to give effect to every word, clause, and sentence."

*LabCorp*, 2024 WL 5249087, at *4 (quoting *Ritchie v. Rupe*, 443 S.W.3d 856, 867 (Tex. 2014)). The First Court noted that "[t]he fact that [section 36.002(2)] does not use the word 'material,' while the text of other unlawful acts in the same statute contains the word, demonstrates the Legislature's choice not to impose a materiality requirement in [section 36.002(2)]." *Id.*

---

[14] *State ex rel. NPT Assocs. v. Lab'y Corp. of Am. Holdings*, No. 01-23-00043-CV, 2024 WL 5249087 (Tex. App.—Houston [1st. Dist.] Dec. 31, 2024, no pet. h.) ("*LabCorp*").

As with section 36.002(2), the text of section 36.002(7)(C) is "clear and unambiguous,"[15] providing no reason for this Court to rewrite the statute in opposition to legislative intent.[16] While Defendants present the scenario of an appellate court overruling a trial court as "conflicting decisions"[17] this is merely another example of Defendants' use of generous rhetoric to disguise their insubstantial position.

Additionally, the recent *Malouf*[18] decision does not alter the lengthy and consistent line of precedent requiring courts to take statutes as they are written.[19] *Malouf* leaves the basic canons of statutory interpretation intact, including the tenet that "[i]f the text's meaning is unambiguous, we do not resort to extrinsic aids or special rules of construction." *Id.* at 718 (citing *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389 (Tex. 2014)).

---

[15] *LabCorp*, 2024 WL 5249087, at *5.

[16] It is worth noting that one of the other claims Plaintiffs assert against Pfizer is under section 36.002(2), which, as *LabCorp* and the plain text of the statute makes clear, does not require materiality. Defendants do not challenge section 36.002(2).

[17] Defs. Pet. at 21.

[18] *Malouf v. State ex rels. Ellis*, 694 S.W.3d 712 (Tex. 2024).

[19] It is worth noting that *LabCorp* was decided six months after the *Malouf* opinion, and includes citations to *Malouf*.

*Malouf* merely reaffirms the axiom that *if* ambiguity exists in penal statutes such as the THFPA,[20] the ambiguous provision(s) should be strictly construed against the State. *See id.* Yet when discussing the strict construction of penal statutes, the *Malouf* Court again cautions:

> Like all common-law construction rules, however, the rule of lenity applies only to the extent the statute at issue is *unclear or ambiguous*. Indeed, to say that a statute will be "strictly construed" is simply to say that any uncertain or ambiguous provision will be construed in favor of a particular party or result.

*Malouf*, 694 S.W.3d at 720 (emphasis added). So while Defendants are correct that the rule of lenity applies to a penal statute when an ambiguous provision is being evaluated, this rule is inapplicable when the provision in question is *not* ambiguous. As explained above, there is no ambiguity regarding the omission of materiality from section 36.002(7)(C) and thus, this Court must refrain from applying the rule of lenity or any other extrinsic aid.

Because Defendants cannot identify any legitimate ambiguity, they instead kick up dust, repeatedly accusing Plaintiffs of pursuing a "gotcha" case. Defendants' attempt at misdirection is entirely irrelevant to the question of whether the Legislature

---

[20] Additionally, *Malouf* did not change the legal landscape regarding the THFPA's status as a penal statute. The Supreme Court had previously held that the remedies outlined in the THFPA are "undeniably punitive in the aggregate" and that they "are penalties, not damages." *In re Xerox Corp.*, 555 S.W.3d 518, 527 (Tex. 2018).

hid a requirement for materiality within section 36.002(7)(C). Still, it is worth dispelling the problematic arguments that Defendants raise.

For example, Defendants equate their conduct with that of a manufacturer neglecting to replace a facility's lightbulbs in a timely fashion. *See* Defs. Pet. at 11. While there are issues with this hypothetical—for example, the presumption that a failure to replace lightbulbs is per se immaterial—the more telling problem is that Defendants compare their conduct with something they clearly believe to be inconsequential. But here, Plaintiffs allege that Defendants spent at least *six years* knowingly manipulating and concealing quality control testing for QXR—a drug manufactured for children—in such a manner that Defendants could not say whether the drug was working as intended, even in the face of numerous patient complaints. SAP ¶¶ 49-84; 99-109. Defendants did not take proper corrective action until the FDA finally uncovered the issue and sent a Warning Letter, which unambiguously declared QXR to be adulterated based on Defendants' deficient quality control practices. SAP ¶¶ 110-122.

If this is the type of conduct that Defendants believe to be a "mere foot-fault"[21] then they appear to have excessively low standards for how pharmaceutical companies ought to conduct themselves. This dismissive attitude towards patient safety and the

---

[21] Defs. Pet. at 16.

proper expenditure of taxpayer dollars elucidates why the THFPA "plays such a crucial role in the State's ongoing 'efforts to deter, detect, and punish' [fraudulent] schemes." *Malouf*, 694 S.W.3d at 721 (Tex. 2024) (quoting *In re Xerox Corp.*, 555 S.W.3d at 525).

Defendants additionally contend that the word "adulteration" necessarily implies materiality. *See* Defs. Pet. at 20. This is not the controlling legal question the trial court identified in its Amended Orders, however, and is not an argument Defendants raised previously. In pursuing a permissive appeal, Defendants may not add to the trial court's description of the controlling legal question. *See City of Houston v. Houston Professional Fire Fighters' Association, Local 341* 626 S.W.3d 1, 23 (Tex. App.—Houston [14th Dist.] 2021), aff'd, 664 S.W.3d 790 (Tex. 2023)).

Even so, Defendants' proposed reading of section 36.002(7)(C)—that "materiality" is baked into the word "adulterated"—would create a schism with the rest of section 36.002(7)(C), injecting ambiguity where it does not presently exist. Distributing an adulterated product is one way to violate this provision, but so is distributing a product that is "debased," "mislabeled," or "otherwise inappropriate." Tex. Hum. Res. Code § 36.002(7)(C). Taken literally, Defendants' argument implies that the Legislature intended only *one* of the types of conduct circumscribed by section 36.002(7)(C) to require a showing of materiality.

The same can be said about the other unlawful acts enumerated by section 36.002(7), all of which are modified by the requirement that a defendant act knowingly. The Legislature surely did not intend for only *one* of section 36.002(7)'s unlawful acts to require an additional showing of materiality, but that is a necessary result of Defendants' position.

At bottom, Defendants want section 36.002(7)(C) to contain an unwritten element of materiality. But that desire is insufficient to satisfy the first prong of section 51.014(d). In contrast, Plaintiffs maintain the uncomplicated and uncontroversial position that the statute should be read exactly as written and that this Court (and any court) should interpret the Legislature's omission of "material" as deliberate, rather than unintentional or secretive. Accordingly, the Court should decline to accept this appeal.

## III. An Immediate Appeal Would Not Materially Advance the Ultimate Termination of the Litigation.

Even if the Court finds that section 51.014(d)(1) is satisfied, Defendants do not properly explain why an immediate appeal would materially advance the ultimate termination of the litigation. *See* Tex. Civ. Prac. & Rem. Code § 51.014(d)(2). An interlocutory appeal on the issue of materiality under Tex. Hum. Res. Code § 36.002(7)(C) would not advance the case toward resolution, much less substantially so. Instead, it would serve only to further delay the proceedings. This serves as a

separate and independent reason as to why Defendants' Petition should be denied.

In addition to THFPA section 36.002(7)(C), Plaintiffs bring claims under sections 36.002(1), (2), and (4)(B) against Defendant Pfizer. Defendants' appeal relates exclusively to section 36.002(7)(C), leaving the remaining claims unaffected. Sections 36.002(1) and (4)(B) already require the Plaintiffs to plead materiality. Plaintiffs have properly done so, and those causes of action are not challenged here. Section 36.002(2), on the other hand, does not contain materiality as an element. *See LabCorp*, 2024 WL 5249087, at *5. So, for Defendants to argue that a decision in their favor would lead to the collapse of this case—presupposing that Plaintiffs are unable to plead materiality with respect to the section 36.002(7)(C) claims—is misguided, at best.

Additionally, a decision in Defendants' favor rewriting section 36.002(7)(C) to add an unstated element of materiality would not change the fact that QXR *was* adulterated under the FDCA and TFDCA and, thus, in violation of both federal and state law, which serves as the basis for Plaintiffs' other causes of action. Thus, even assuming a decision adverse to Plaintiffs' position, Plaintiffs would still need to conduct discovery into Tris's handling of QXR testing; Pfizer's oversight of Tris; Defendants' representations to Texas Medicaid; and issues relating to materiality, among others.

Lastly, while it is true that Plaintiffs bring only a section 36.002(7)(C) claim against Tris, the same argument applies. Plaintiffs did not plead what they were not required, by the plain text of the statute, to plead. This does not mean Plaintiffs could not plead materiality with regards to section 36.002(7)(C), if required.

## CONCLUSION

Because neither of the requirements of section 51.014(d) are met in this case, the Court should decline to hear this permissive appeal.

Date: March 10, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**AMY SNOW HILTON**
Chief, Healthcare Program Enforcement Division

*/s/Jordan Underhill*
JORDAN UNDERHILL
Assistant Attorney General
Texas State Bar No. 24102586
Jordan.Underhill@oag.texas.gov

JONATHAN D. BONILLA
Assistant Attorney General
Texas State Bar No. 24073939
Jonathan.Bonilla@oag.texas.gov

21

VIVIAN I. EGBU
Assistant Attorney General
Texas State Bar No. 24079078
Vivian.Egbu@oag.texas.gov

NADIA BURNS
Assistant Attorney General
Texas State Bar No. 24041176
Nadia.Burns@oag.texas.gov

Office of the Attorney General
Healthcare Program Enforcement Division
P.O. Box 12548, Capitol Station 056
Austin, Texas 78711-2548
Telephone: (512) 936-9932
Facsimile: (512) 320-0667

**ATTORNEYS FOR THE STATE OF TEXAS**

*/s/ Jason T. Brown (by permission)*
Jason T. Brown (*pro hac vice*)
Brown, LLC
111 Town Square Place, Suite 400
Jersey City, New Jersey 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
jtb@jtblawgroup.com

**ATTORNEY FOR RELATOR
TARIK AHMED**

22

**CERTIFICATE OF COMPLIANCE**

I certify that according to the word count of the computer program used to prepare this document, this document contains 4,500 words, not counting the parts of the document excluded under Texas Rule of Appellate Procedure 9.4(i).

/s/ Jordan Underhill
Jordan Underhill

# CERTIFICATE OF SERVICE

I certify that a copy of this document was served by delivery to counsel below

by email and through the electronic case manager on March 10, 2025:

**BROWN, LLC**
**Lead Counsel**

Jason T. Brown
(Admitted *Pro Hac Vice*)
Patrick S. Almonrode
(Admitted *Pro Hac Vice*)
111 Town Square Place, Suite 400
Jersey City, New Jersey 07310
(877) 561-0000 (telephone)
(855) 582-5297 (facsimile)
jtb@jtblawgroup.com
patalmonrode@jtblawgroup.com

**POTTER MINTON**
**A PROFESSIONAL CORPORATION**
**Local Counsel**

Michael E. Jones
E. Glenn Thames, Jr.
102 North College, Suite 900
Tyler, Texas 75702
(903) 597-8311 (telephone)
(903) 593-0846 (facsimile)
mikejones@potterminton.com
glennthames@potterminton.com

*Attorneys for Relator Tarik Ahmed*

**GILLAM & SMITH LLP**

Harry "Gil" Gillam, Jr.
Tom Gorham
303 S. Washington Ave.
Marshall, Texas 75670
(903) 934-8450 (telephone)
(903) 934-9257 (facsimile)
gil@gillamsmithlaw.com
tom@gillamsmithlaw.com

**BLANK ROME LLP**

William E. Lawler III
(admitted pro hac vice)
1825 Eye Street NW
Washington, D.C. 20006
william.lawler@blankrome.com
Bobbye Pyke
717 Texas Avenue, STE 1400
Houston, Texas 77002
bobbye.pyke@blankrome.com
Huaou Yan
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
huaou.yan@blankrome.com

*Attorneys for Defendant Tris Pharma, Inc.*

**THE VAL JONES LAW FIRM**

George Valton ("Val") Jones
109 West Austin St.
Marshall, TX 75670-3340
(903) 927-2220 (telephone)
val@valjoneslaw.com


**FOLEY & LARDNER LLP**

Edward D. ("Ed") Burbach
600 Congress Avenue, Suite 2900
Austin, Texas 78701
(512) 542-7070 (telephone)
(512) 542-7100 (facsimile)
eburbach@foley.com


**ROPES & GRAY LLP**

Samantha Barrett Badlam
(Admitted *Pro Hac Vice*)
Stefan P. Schropp
(Admitted *Pro Hac Vice*)
2099 Pennsylvania Ave., N.W.
Washington, DC 20006-6807
(202) 508-4734 (telephone)
samantha.badlam@ropesgray.com
stefan.schropp@ropesgray.com

*Attorneys for Defendant Pfizer, Inc.*

*/s/ Jordan Underhill*
Jordan Underhill

25

No. 15-25-00021-CV

# In the Court of Appeals
# for the Fifteenth Judicial District
# Austin, Texas

---

PFIZER INC. AND TRIS PHARMA, INC.,

*Petitioners/Defendants*,

*v.*

THE STATE OF TEXAS AND TARIK AHMED,

*Respondents/Plaintiffs.*

---

On Appeal from the
71st Judicial District Court, Harrison County

---

# APPENDIX

---

|   |                                                                                                      | Tab |
|---|------------------------------------------------------------------------------------------------------|-----|
| 1. | Transcript of Motion to Dismiss Hearing, June 10, 2024                                               | A   |
| 2. | Order Denying Defendants' Joint Motion to Amend Previous Orders and Certify for Interlocutory Appeal | B   |
| 3. | Transcript of Motion to Amend Hearing, January 27, 2024                                              | C   |

**Tab A: Transcript of Motion to Dismiss Hearing, June 10, 2024**

CAUSE NO. 23-1030

THE STATE OF TEXAS EX REL ) IN THE DISTRICT COURT
TARIK AHMED              )
                         )
vs.                      ) HARRISON COUNTY, TEXAS
                         )
TRIS PHARMA, INC., AND    )
KETAN MEHTA              ) 71ST JUDICIAL DISTRICT


CAUSE NO. 23-1031

THE STATE OF TEXAS EX REL ) IN THE DISTRICT COURT
TARIK AHMED              )
                         )
vs.                      ) HARRISON COUNTY, TEXAS
                         )
PFIZER, INC., TRIS        )
PHARMA, INC., NEXTWAVE    )
PHARMACEUTICALS, INC., AND)
KETAN MEHTA              ) 71ST JUDICIAL DISTRICT


_____

MOTION TO DISMISS
_____


On the 10th day of June, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE BRAD MORIN, Judge Presiding, held in Marshall, Harrison County, Texas:

Proceedings reported by computerized stenotype machine, Reporter's Record produced by computer-assisted transcription.

**P R O C E E D I N G S**

(JUNE 10, 2024)

THE COURT:  All right.  Court's going to call 23-1030, State of Texas versus Tris Pharma and Ketan Mehta and 23-1031 State of Texas versus Pfizer, Tris Pharma, Nextwave Pharmaceuticals, and Ketan Mehta.

Announcements, please?

MR. JONES:  Your Honor, Val Jones for Pfizer, Samantha Badlam and some other lawyers that we have here, and we're ready on our motion to dismiss 91A.

MR. GORHAM:  Good afternoon, Your Honor.  Tom Gorham on behalf of Ketan Mehta and Tris Pharma, and with me here is my law partner Gil Gillam.  Also joining us is Barrett Howell from Blank Rome.  We're ready to proceed.

MR. BONILLA:  Jonathan Bonilla and Jordan Underhill for plaintiff State of Texas.  We're ready as well.

THE COURT:  All right.  Mr. Gorham, I believe it's your motion.

MR. BONILLA:  Mr. Howell will be presenting for us.  Oh, I'm sorry.  Who do you want to start with?

THE COURT:  Well, they look like they're

intertwined here, so I'll let you figure it out. It doesn't make a difference to me where we start.

MR. JONES: If it please the Court, Your Honor, we -- all parties have talked about splitting the two hours up, and if it's okay with you, we're -- Pfizer will take 40 minutes, and I'm going to take the first five, and then Ms. Badlam is going to come up and make sense of what I say.

THE COURT: All right.

MR. JONES: And she -- if it's okay with the Court, she will quit 30 minutes, and we've leave five minutes for rebut.

THE COURT: Great. Mr. Jones.

MR. JONES: Your Honor, as the Court knows, this is a case where Pfizer and Tris are defendants against the Texas Attorney General's office in a case alleging fraud under the Texas Medicaid Protection Act.

And, Judge, we -- in 2013 approximately, Tris -- prior to that, Tris created an ADHD medicine that -- that was known as Quillivant. Also throughout this hearing, we'll just call it QXR, also known as QXR -- primarily for children.

And in 2013, we -- the FDA approved this in September of 2012, this drug, and in 2013, Pfizer had

purchased the drug. We were going to market it and sell the drug.

We did what the first step is after the FDA has approved the drug, and we filled out an application known as a VDP, which is a vendor drug program application, where we fill out, send it in.

And the Medicaid arm of the Health and Human Services Commission -- let me get rolling here -- received our application in January of '13, and it was authorized by Medicaid, and -- and eventually in 2014, it went on to be placed on the preferred drug list, PDL.

As soon as it was authorized, we had the right to market and sell the drug here in Texas. We did that from 2013 to 2018, and that is when Tris purchased it back from us.

This case, Your Honor, as you know, is brought under this act, and after we marketed and sold the QXR for five years, we were full steam ahead. We had -- the prescriptions were written to Medicaid after Medicaid authorized recipients. The doctors prescribed them. The drug companies -- drug stores sold it.

And Medicaid paid like clock work and obviously were very happy with this drug because they paid and they paid over and over and over and over and over and over again. Many people used it. There was

approximately about a hundred thousand prescriptions written when Pfizer owned it that were paid by Medicaid.

In -- with the Health and Human Services Commission and, you know, Medicaid's blessings, this continued the full time that we owned it, and the -- then, as the Court knows, in November of '23, last year, the State of Texas sued Tris and Pfizer.

The lawsuit -- and we will back to this several times, but the lawsuit, Judge, is about fraud. It's about them saying that Pfizer defrauded the State under this act and under this -- the code and the facts of the case.

I think you're going to see, Your Honor, the facts of the case and the -- the legal grounds aren't there. It's -- it's -- they're trying to make silk out of a sow's ear. They're trying to make fraud out of non-fraud.

They're trying to make fraud out of laws that don't say what they're trying to say they say and out of facts that you're going to see in the allegations and the cause of actions they've done -- they filed that don't say what they say they say.

This -- this -- there are four basic allegations of cause of actions that we're dealing with in this case, and Ms. Badlam is going to come up and show

the Court what we're talking about on the facts that are given in the petition that they have filed, also with the application, the VDP application that was filed with the act itself, the statute itself.

There are two that are dealing with a certification paragraph in the application for VDP, and you're going to see that the certification does not say what they're trying to make it say, and if it doesn't say what they're making it say, it's not fraud, period.

Also, Judge, one -- you're going to hear a term called adulteration, a situation which how product was developed. Sam is going to talk to you about that, but you're going to see that there is no law that requires Pfizer to do what they said Pfizer had to do that would amount to fraud. Without that, there's no fraud.

And then last, Your Honor, is the TMFP Act, which in itself in 36.002 where it says unlawful acts, she's going to point out to you there how they can't hold Pfizer responsible under that act because we haven't -- the -- the key significant trigger of whether it's on your -- your product is authorized or unauthorized to sell hasn't been pled, and so they can't hold us responsible or liable under that particular act.

There's none of the allegations and none

of the causes of action that they have brought in this case, Judge, that are -- that are based in facts or law in their petition and the four corners of that petition.

It is truly making silk out of a sow's ear. They're making this into a situation that so many like to do that's some kind of strict liability and the whole basis is what they say. We say fraud. We say fraud. We stamp fraud. It's fraud. You've got to accept it's fraud, and we've gotcha.

It's a we gotcha deal, and they're trying to use the statute to enrich some whistleblower in a law firm in the state when we've not done anything wrong and we've not violated this statute as they say.

You know, Judge, when they -- when they present their case, you may ask them that if this is such a terrible product or if there were incidences that we should have done something concerning this product, why did they continue -- why did Medicaid continue to pay for it and still paying for it to this day? Not once did they stop doing that.

The -- you know, Judge, the damages, it's obvious what they're after. It's obvious what they're going for. It's pled in their damages, and, you know, they want all their money back that they have paid for Medicaid patients to get this drug. They want two times

that amount of money for good measures.

They want civil penalties. They want pre- and post-interest and attorney fees, and then the 10,000 pound icing on the cake is under the statute they want anywhere from 5500 to $11,000 per prescription that they say violated the statute based on fraud.

Fraud's not in this case. It doesn't exist, and I think Ms. Badlam is going to be able to come up and show you that and dissect that.

Also, Judge, you know, they've got injunctive relief in here. If they really thought this product was so bad, they really thought some fraud was committed, why wouldn't they ever come to this courtroom and get the injunctive relief they asked for?

They've never done that. Because they're not worried about it. That's why they keep paying for it. That's why they like it, but now they just want a gimme back, and they want to become rich on the back of Pfizer for something Pfizer didn't do.

MS. BADLAM: Thank you.

THE COURT: Ms. Badlam.

MS. BADLAM: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. BADLAM: So to be clear, this is Pfizer and Tris Pharma's 91A motion to dismiss the

petition in the Quillivant matter. There is a separate matter, which Pfizer is not a party in, that is -- that is separate.

As Mr. Jones previewed, there are four causes of action at issue here today. I'm going to go ahead and put the statute up on the screen here behind me. Hopefully you can read that.

These are the four provisions of the Texas Medicaid Fraud Prevention Act that this matter is about. Three causes of action are based on claims that Pfizer knowingly made false statements, misrepresentations, and/or non-disclosures in connection with QXR's inclusion on the vendor drug program formulary and the preferred drug list. That's what Mr. Jones was explaining.

If a drug is included on the vendor drug program formulary, it is authorized for payment by the State, and then the VDP application, which we're going to talk through -- we have a little packet of materials for you.

MR. JONES: I'll pass them out to the other side.

THE COURT: All right.

MS. BADLAM: In the package, there's a PowerPoint. There's also the statute with the relevant provisions highlighted. There's the 91A standard, and

there's also the VDP application with the certification contained in it. This is going to be a main topic of discussion today. It's page six on the VDP application.

So the application itself serves as the basis for inclusion to the VDP formulary, and two causes of action specifically relate to false statements, and these causes of action have no basis in law and no basis in fact and must be dismissed in their entirety.

So let's talk about these first and third causes of action in plaintiffs' petition, which are based on false statements. So as you can see on the screen, these causes of action are discussed in paragraphs 124 and paragraph 126 of the petition.

The first cause of action, plaintiffs allege that Pfizer knowingly made a false statement or misrepresentation of material fact under Section 360021 when Pfizer certified on the VDP application that QXR was not in violation of federal or state law and that it would update Texas Medicaid as to any change in Quillivant's product status.

Plaintiffs' cause of action number three, which is the one in 126, also alleges that Pfizer knowingly made a false statement or misrepresentation of material fact under 360024B with the same certification because it concerns information required to be provided

by federal or state law, rule, regulation, or provider agreement pertaining to the Medicare program.

So these two causes of action on alleged knowing false statements are specifically based on the representation in the VDP application. So I'm going to pull this up on the screen. If you want to see the actual certification in the paper there, it's page six, like I mentioned.

So this is what -- this is what the certification says, and, again, these are two causes of action that are based on the certification. The certification reads, I certify that the information is correct to the best of my knowledge and that the product is not now in violation of either federal or state law.

I also agree to inform the Health and Human Services Commission in writing of any changes in formulation, product status, price or availability, as herein described, within 15 days of such change.

And you can see on the screen and on the paper that this certification was made by Pfizer on January 8th, 2013.

Plaintiffs' allegations concerning this VDP application are both factually and legally flawed. First, Pfizer submitted this VDP application and the certification in January of 2013, certified that QXR was

not now in violation of federal or state law.

If you look at the petition, the petition concedes on paragraph 64 -- and it's up on the screen, Your Honor, -- that Pfizer did not know until June 2013 that Tris was even considering changing its dissolution test method, and that is the first date that Pfizer allegedly knew something was amiss according to plaintiffs.

We're going to talk a lot about this dissolution testing, and I'm going to explain what that is in just a minute, Your Honor, but the important point here is that the allegation about the wrong conduct is June 2013 where the certification was made in January 2013.

So even if you were to believe that considering changing a dissolution testing method somehow violated federal or state law, which it does not, there is a basic timing problem with plaintiffs' allegations.

And there are other allegations concerning the other supposed wrongful conduct that are even later in time. They're in -- you can see here -- September 2013 and June 2014.

Those are the allegations about consumer complaints and particle testing, so even later than the June 2013 date and much later than the January 2013 date

when the certification went in.

Now, plaintiffs have one conclusory allegation in the petition that as early as October 2012 Pfizer was aware that Quillivant was having difficulty meeting its FDA mandated testing specifications.

But this doesn't help their cause because the allegation itself acknowledges that the product was meeting its testing specifications. Having difficulty meeting a testing specification is not a violation of federal and state law.

If you look at the petition, there is not one allegation that prior to this January 2013 certification that Pfizer knew of any conduct that could have been said to have alleged federal -- violated federal or state law.

So let's talk about the second part of the certification because there's two sentences. The second part of the certification requires Pfizer to update HHSC about changes to QXR's product status.

Plaintiffs allege that Pfizer made a material false statement in the certification because Pfizer failed to update HHSC on changes to product status, QXR's product status, but you'll see here in the certification it specifically says as herein described.

So what is described in the VDP

application as it relates to product status? I have up on the screen the relevant sections as it relates to product status.

Product status includes at most the NDC number, the DEA schedule, and, most importantly, FDA approval status. The information contained within the VDP application on product status has nothing to do with the issues in the petition.

So I want to take a minute to pause and talk about the issues in the petition because there's three main issues, dissolution testing, particle size testing, and investigations into lack of effect complaints.

The big area is this dissolution testing, so I want to explain what dissolution testing is.

THE COURT: Thank you.

MS. BADLAM: So dissolution testing, it's a post-manufacturing control where the liquid is put into essentially a fake stomach, and the fake stomach mimics the body, and it measures the release rate of active ingredients at set intervals of time. So it's 30 minute, four-hour, eight-hour, 12-hour increments, and it's measuring the release rates.

QXR's, this medicine, it comes in a powder, so in order to test the product, it has to be

made into its liquid form because it's an ADHD medicine, once a day, given in the morning.

It's a liquid medicine, and that was what made this probably unique.  It wasn't a pill, so it could be given to children easily because it was a liquid medicine.

So in order to make the liquid medicine, you take the powder, and you add the water, and that's what's called reconstitution, and I'm sure you saw that in the petition and our motion, reconstitution.  It's literally just mixing the powder with the water to make the liquid form, and then that is what's tested.

So when we talk about dissolution testing and the changes to dissolution testing at issue in this case, what changed was the way that that sample was prepared for testing.  So the way that the water was added to the powder.

So it's almost like a -- if you think about it like a Gatorade, like a powder Gatorade where you add the water and shake it up and it dissolves.  That's basically what we're talking about here with this medicine.

And that's what changed, the way in which the water was added to the powder.  Not the measurements, not the specifications, none of that changed.  Just the

way that it was mixed.

And why does that even matter? Well, because it matters because of the hydration; right? If you add water to powder, it has to be time for it to hydrate. So there were changes made to how the preparation was done for the hydration purposes.

You'll see allegations about sonication. Well, sonication, what that is is just a -- it's a machine with sound waves, and it agitates the particles to try to get them to hydrate quicker.

Likewise, if you add a hold time. So if you mix the powder with the water and you let it sit there, it's going to hydrate over time because it takes time for the particles to hydrate.

So what's important to remember about this, though, is that when you're talking about this liquid medicine, this issue of reconstitution only impacts that very first dose because after the first dose, it's completely hydrated.

So the question is then why? Why change the method? Why do all of this; right? Well, what it did was it actually more accurately mimicked real life conditions around the dispensing of this product.

Because a pharmacist, when they mix the product, when they reconstitute the product, they don't

turn around and hand it to a child immediately who takes the medicine. That's not how this works; right?

This is a stimulant. It's given in the morning, ADHD medicine, before school, and it releases throughout the day, so the way that this typically works is; right, a parent would call in a prescription. The pharmacy mixes it, and it sits.

And then the parent comes and picks it up most likely the night before, and it will sit at home, or maybe they will pick it up several days before, and it's sitting there, and it's hydrating; right?

It's not going to be the case that a parent calls the pharmacy, runs to the pharmacy at 7:00 a.m., gives the medicine before the child gets on the bus. That's not -- that's not how this works. So when you're talking about changing the method for preparation, it's more accurately mimicking those real life conditions.

But going back to the cause of action here, because this is the key part about the first and third causes of action of why they're just legally flawed, is that this whole issue with dissolution testing and changing the sample preparation method has nothing to do with product status as herein described the application; right? There's a certification.

Likewise, any allegations about investigations into out of spec dissolution testing results, also not related, not herein described in the application.

Same with the particle size testing. This is the second issue. I mean, this isn't actually even an issue based on the allegations in the -- in the petition because they actually describe the right process that Pfizer went through to submit the submission to FDA. But, still, particle size testing, nothing to do with this application.

And on the third category, these investigations into consumer complaints, not contained within this application. Nothing to do with the application.

So why are we even talking about this? Plaintiffs in their opposition to our motion, what they're trying to do now is actually bootstrap this false misrepresentation argument together by combining these two certifications in this application.

So what they're saying is that the second requirement about updating on product status as herein described also requires an update to violations of federal or state law.

But the plain reading of the

certification, that's not what it says. I mean, it clearly says not now in violation and I will update on product status. It's really a straightforward interpretation question.

Plaintiffs' reading is also completely impractical and unworkable. They are saying that the certification requires companies to affirmatively disclose every CGMP violation that could possibly render a product adulterated no matter how trivial and unrelated it is to the content actually contained in this application.

And we're going to talk about the CGMP violations a lot today. So Current Good Manufacturing Practices, that's those -- that's those regulations there in the FDA regulatory framework and the Texas regulatory framework. There are 50 provisions, all with subparts, on the specific good manufacturing practices.

And there are things in there, for example, failing to sign a document in accordance with an SOP can be a CGMP violation. The idea that this certification is requiring a company to update HHSC on every single one of these CGMP violations is ludicrous, and it's not what this says.

The first, third cause of action here must be dismissed as a matter of law. They're -- they're

foreclosed by plaintiffs' own allegations, and, therefore, they should be dismissed.

So those are the false statement allegations, so let's turn to the second cause of action. So this is the cause action if you were to look at the statute. It's 360022. This is the failure to disclose cause of action.

So the statute specifically says knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment authorized. In other words, Your Honor, if the information had been disclosed, then the Texas Medicaid program would not have authorized payment for the drug.

So let's start with what Pfizer allegedly failed to disclose according to plaintiffs. As on the screen and spelled out in paragraph 125 of the petition, this cause of action hinges on Pfizer's failure to disclose known quality issues related to dissolution testing, particle size testing, and investigations of lack of effect claims.

During the initial VDP application process, the process we just talked about, and to the DUR board, which is formerly the PT -- P&T committee, the

P&T -- that's DUR board, formerly the PT -- P&T committee, recommends drugs placement on the preferred drug list. And the preferred drug list, what that is, it's critical because that means the drugs don't require prior authorization.

So plaintiffs are alleging that there were failure to disclose information as part of this process and the VDP application. We've talked about the VDP application extensively, and Pfizer couldn't have been obligated to tell HHS about something that based on plaintiffs' own pleadings Pfizer didn't even know about until five months after the VDP application was submitted.

So I want to talk about the preferred drug list. Once the drug is approved, is authorized by the DUR board -- excuse me -- by the VDP program -- there's a lot of acronyms in this case. Vendor drug program formulary is when it's authorized and it can be paid, and then the PDL is the preferred drug list. Putting on the list they don't have to get prior authorization.

The DUR board is responsible for making recommendations what drugs go on the PDL, and HHSC considers DUR board's recommendations, and it also considers FDA's determination of clinical safety and efficacy when figuring out what drugs to put on this PDL

list.

So plaintiffs are alleging that Pfizer failed to disclose to the DUR board information concerning the issues related to QXR in points of time, January of 2014 when the DUR board first considered and ultimately recommended adding QXR to the PDL, and then later in November of 2017 when the DUR board considered whether to continue listing QXR on the PDL.

So I want to be clear here about the PDL because this is a point that Mr. Jones made earlier. The product has remained on the PDL. It was never removed from the preferred drug list to this day.

So not only was it never not authorized. It continued to be authorized in the State of Texas for payment by the State Medicaid program. It continued to remain on the PDL.

And this is the fundamental deficiency with plaintiffs' claim based on their own petition. Once the information was disclosed, plaintiffs continued to authorize payment and continued to keep the drug on the preferred drug list.

The issues in this petition have been in the public domain for many, many years. It started in 2017 when a letter went out, and then the big issue, which you're going to hear a lot about today, is the

March 2018 FDA warning letter.

And the warning letter concerned issues directly on point to the allegations that are in the petition, and this is critical because the warning letter -- and I'm going to talk more about what this is and what it means, but the point here is that the information that is in this petition was publicly available as of March 2018.

It was available on FDA's website. The warning letter, industry publications published it. There were articles on this. It was out there in the public.

And then four days later after that warning letter came out, FDA explicitly permitted the release of 11 batches of QXR that were potentially impacted by the dissolution issues, a topic here today, and permitted those to be released to the market, which they never would have done if there was any issue with the product.

And while they were doing that, they issued a letter. A letter went out to doctors. It's called the Dear Health Care Provider letter, another publicly available disclosure, and then, of course, the AG's three and a half year investigation.

Through this entire time, starting back in

2018, the product continued to be authorized for payment in Texas and continued to remain on the PDL.

Neither the petition itself nor HHSC's actual conduct provides any basis to conclude that the State would have revoked authorization of QXR had the issues been disclosed, which is what's required in this particular section of the TMFPA.

Because when the information was disclosed, it was not investigated. They continued to authorize payment. This cause of action is foreclosed as a matter of law.

I also want to point out one other -- one other point that's discussed in the briefing on this, and this relates to whether there's some other legal obligation to disclose these issues to the DUR board.

So the DUR board, as I mentioned earlier, looks at efficaciousness, safety, clinical significance, and, importantly, cost effectiveness, and then it also considers the FDA's consideration of clinical efficacy and safety and then makes determinations.

So unlike the VDP process where there's a formal application, there is no application. There is no list of things that you have to provide. There really is no obligation to provide anything.

In fact, if you look at plaintiffs'

response on this, they actually say a pharmaceutical manufacturer does not have an obligation to present information to the board.

But the plaintiffs, what they do say in their opposition, they try to say that these alleged issues in this -- in this petition about dissolution testing and particle size testing and investigations, that these raise red flags of safety and efficacy. That's what they say in their opposition.

But if you look at the petition, they -- these allegations are not in the petition. There are no allegations that QXR's safety or efficacy was compromised in any way.

What we have is one conclusory allegation in paragraph 108 that insinuates that potentially there was some efficacy impact going on with QXR, but this section is not about dissolution testing. It's completely separate from dissolution testing. It's actually about failure to investigate complaints about lack of effect.

When we talk about complaints, what we're talking about is consumers who are calling and saying the medicine doesn't work; right? It happens all the time. My -- my blood pressure medicine isn't working. My headache medicine isn't working; right? The doctors may

switch your dosage, but that's what we're talking about as consumer complaints about lack of effect.

They're not connected to the dissolution testing issues here. There's insinuations that are trying to be made. That's not what -- that's not what the petition actually says.

There are no claims in that petition that the safety and efficacy was compromised in any way that would have required some type of affirmative disclosure to the DUR board, and even more importantly than that -- not that that's not important, but even more critical is FDA's involvement.

So the petition is replete with references to FDA and FDA's involvement in this matter and how they knew about the issues, how they were involved in the issues, by that November 2017 period of time where plaintiffs allegedly -- defendants allegedly failed to disclose something to the DUR board in November of 2017.

FDA was fully involved, and FDA never required QXR to be removed from the market, never made any findings about QXR's safety or efficacy, and plaintiffs just ignore FDA's rule in their response. They don't even address it, but the petition does, and the petition talks about it.

In fact, as I mentioned earlier, FDA

explicitly permitted the release of those batches that were potentially impacted by the dissolution testing issues right after the warning letter.

At the end of this day, this allegation here in the second cause of action has to be dismissed as a matter of law.

I mean, the -- not only did FDA know about all of this and never made any findings of safety and efficacy that would have required some type of affirmative representation to the DUR board. But once the State knew about the allegations in this petition, they continued to authorize payment. That -- that can't survive under the way the TMFPA is pled.

So let's talk about the fourth cause of action. This is the one that relates to both Pfizer and Tris. The first three are just about Pfizer.

This one is the adulteration cause of action under 360027. So it's critical that we look at the language of the statute in this section in its entirety. It's up on the screen. It's highlighted for you in that printout.

A person commits an unlawful act under the TMFPA by knowingly causing to be made a claim under the Medicaid program for, A, a service or product that has not been approved or acquiesced in by a treating

physician, meaning a claim for a product or service that the treating physician hasn't authorized.

B, a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards, meaning that it's not appropriate treatment for a given condition.

And then, C, a product that has been adulterated, debased, mislabeled, or is otherwise inappropriate, meaning in context a product that is defective in some way.

All of these specific provisions here relate to fraud in some way; right? The State doesn't want to pay for a product that is defective. The State doesn't want to pay for a product that your doctor didn't authorize. The State doesn't want to pay for a product that isn't up to par in terms of medical treatment.

It all makes sense because the statute, as Mr. Jones started this conversation about, is about fraud, and this is a key concept when you're looking at the word adulterated.

Because as I mentioned earlier, adulterated, when you look at the regulatory scheme here, can mean so many different things, many technical, immaterial CGMP violations.

But this term as used in the statute has a

clear connotation. It's focused on being defrauded, and the petition itself describes in paragraph 128 the idea is to prevent Texas Medicaid from paying for unauthorized reimbursements.

So -- but here what's happening is that you have CGMP violations that are at issue solely related to manufacturing, has nothing to do with QXR safety and efficacy. What we're dealing with here is a gotcha one. It's a gotcha case.

If there's any CGMP violation, regardless of whether there's an actual impact on drugs that Texans needed and received, they can go after them. They can go after companies. They can use that violation to say, nope, you have to pay us back all the money times two, times penalties. All these other payments have to come back to us because we've gotcha. You have a CGMP violation, so, therefore, the product is adulterated.

But the way the statute is written, the way that particular section is drafted, it's supposed to combat fraud and fraud matters. If you continue paying for a medicine after you know about the alleged CGMP violation, is that fraudulent conduct? Is that something that really matters? Is that what the statute is designed to prevent?

So that's kind of the bigger picture issue

when we talk about this adulteration program, but I want to spend a minute talking about the way that the petition is pled because it's interesting.

There is a lot of detail in it, but if you actually look at that detail, what it is are statements that don't actually allege which CGMP regulations were violated and how those CGMP regulations were violated.

There's five main areas. I know that I'm short on time, so I'm going to go through this fairly quickly, but under -- under this -- these areas, dissolution testing, there's ten pages detailing allegations about sample preparation changes and allegedly improper investigations.

But in this entire section, they don't cite even one CGMP regulation that was violated and explain how it was violated. Their opposition brief is illustrative on this point. They claim that they have cited the relevant CGMP at issue, but they highlight paragraph 119 of the petition, which merely recites the allegations in the warning letter.

Furthermore, so there is no CGMP regulation that they could cite that bars changing the way a sample is prepared for testing, and that's the issue.

By just saying all of this stuff violated

the CGMP regulation without actually citing the regulation or how, they're not providing fair notice. Because in this example, there is no CGMP regulation that the conduct violated.

So the warning letter; right? So what happens is that what we see is that plaintiffs fall back on the FDA warning letter, which has certain observations relating to manufacturing practices at Tris that Pfizer -- excuse me -- that FDA inspectors had when inspecting Tris's facility, so this reflects certain observations around process controls.

The letter itself had nothing to do with the safety and efficacy of the product. Nothing to do with claiming if the product was somehow defective, and, importantly, this warning letter, it's not a final agency action.

The letter says if these issues aren't fixed that the FDA can take action, enforcement action, against Tris, but FDA did not take enforcement action against Tris. In fact, FDA did the opposite. Four days later, they permitted those batches to be released to the market despite issuing this warning letter.

And the agency never revoked approval, never said safety and efficacy was compromised. The agency would have never released those batches had they

thought safety and efficacy was compromised in some way.

So let's talk about the regulatory submissions quickly. Plaintiffs allege that Pfizer and Tris didn't make the correct filings with the FDA regarding their changes to sample preparation method for dissolution testing. This is about the filings.

I'm not going to get into all the reasons why the allegations are just fundamentally wrong from an FDA regulatory prospective. We have to believe them as true, but the bottom line is that there was no CGMP that's cited in this section, nor could they because it actually doesn't violate a CGMP regulation.

The investigation, so there's failure to investigate out of -- out of specification test results. Again, what the petition does is talk about the investigations, but then fails to allege how those investigations violate a CGMP regulation.

They say they're deficient; therefore, they violate a CGMP regulation, but they don't -- they don't state how. They say, well, root cause wasn't determined.

But, Your Honor, there is no CGMP regulation that requires companies to find out root cause of every single issue. It's impossible to do. That's why there needs to be a CGMP regulation that's actually

cited and actually explained how it's violated.

Particle size testing, the fourth issue, again, the allegations describe actually the correct regulatory submission process that Pfizer and Tris follow.

But, once again, it summarily states, oh, well, they didn't investigate those particle size testing issues properly. Again, no CGMP regulation that's cited in that section, no description of why those investigations didn't meet that CGMP requirements.

And, lastly, the failure to investigate lack of effect complaints. There are CGMP regulations that require companies to review complaints that come in. That's the requirement. There are no specific requirements about how those companies should investigate those complaints.

And the petition itself actually acknowledges that the complaints were investigated. Again, not citing why. Why were those investigations deficient? Why did they not meet CGMP regulations?

So, Your Honor, but let's just assume even if we were to believe that QXR was technically adulterated under CGMP violations, the big issue in this case is that the reimbursement was authorized and continued to be authorized under the TMFPA.

This is where the case becomes the gotcha case. Plaintiffs are attempting to use the statute to say that every single violation of an FDA CGMP regulation -- and it should be clear, Texas has a parallel statute, a parallel statutory scheme that mirrors the FDA statutory scheme here.

That every single violation of one of these technical manufacturing regulations renders the product adulterated, meaning that the State gets their money back times two, times penalties.

And the practical impact of this actually is that if a company has a CGMP violation that renders the product adulterated, what it actually means is that company can't distribute or sell the product in the State of Texas.

So FDA can say product is totally fine, product is good, we're finding -- we're finding a violation related to your signatures. Your signatures are not correct. You have a CGMP violation technically rendering the product adulterated.

That would mean that product needs to get pulled from Texas, even though there's nothing wrong with the product itself, even though FDA is not requiring to get it removed from the market. That is the practical impact of how the plaintiffs are reading that statute.

Now, plaintiffs, of course, argue that, well, materiality, it doesn't apply to this section of the TMFPA because it doesn't use the word material.

They cite a case in favor of their position. That's the In Re: Xerox case from the Texas State Supreme Court, but that case, to be clear, has nothing do with materiality. The Texas -- that case is literally for the proposition that statutes should be read based on their plain meaning. It's not about materiality.

And -- and the Supreme Court in that case actually was satisfied that construing our statutes according to their plain and ordinary language ultimately leads to alignment with federal and state laws.

Here the State's position is inconsistent with the TMFPA's language in that specific provision of 360027, which is focused on serious misconduct. It's focused on fraud. Their position is also inconsistent with the TMFPA if overarching goal of targeting fraud and securing the Medicaid program's integrity.

This case around CGMP violations is one of first impression, and the Xerox case supports defendants' position, not plaintiffs.

So here we are now today with Texas saying that Pfizer and Tris violated the law for distributing

and promoting QXR in Texas and wanting all the money back it paid for the drug times two, plus penalties, conveniently only through 2018, which is when Pfizer sold the drug back to -- back to Tris in September 2018.

So even though Texas, once they knew about these issue continued to pay for the drug, continued to authorize the payment for the drug, even though the product was safe and effective, and was never withdrawn from the market, Texas is here saying, nope, they violated the law.  They have to give back all of the money.

They have not alleged the specific conduct at issue in this case, adulterated the product, as intended by the TMFPA, which is designed to prevent, rightly so, the Texas Medicaid program from being defrauded and paying for defective product.

That is not the case here.  Texas continued to pay for the drug because it was safe and effective, and that's why we're here today asking Your Honor to dismiss this case in its entirety.

I think we're just going to hear from our -- do you want to --

MR. HOWELL:  Go to the mic?

THE COURT:  It's up to you.  It doesn't matter.  I mean, I can hear you fine from there or if you

want the podium. I just know that I'll get my ass chewed out if I let you move that other one. It's happened --

MR. HOWELL: Yes, I was told that was non-negotiable.

THE COURT: It is. At this point, I have no butt left, so go ahead.

MR. HOWELL: I promise to be brief, Your Honor. Barrett Howell here on behalf of Tris Pharma, and may it please the Court.

THE COURT: Yes.

MR. HOWELL: We're here to quickly add a few extra points to Tris Pharma's motion to dismiss and notice of enjoinder to Pfizer's motion to dismiss insofar as Pfizer is moving to dismiss the only cause of action that's asserted against Tris.

And just as a procedural point, Your Honor, even though there's two defendants that -- well, three defendants that have been sued, one is Ketan Mehta, the CEO of Tris. We're not here on his behalf because, as the Court may know, his --

THE COURT: Right.

MR. HOWELL: Yeah, stay pending appeal.

THE COURT: Right.

MR. HOWELL: We're just here talking about Tris.

THE COURT: Okay.

MR. HOWELL: The single cause of action that the State alleges against -- against Tris basically accuses Tris of causing false claims to be paid to Texas Medicaid for payment of Quillivant because Tris allegedly knew at the time that Quillivant was adulterated.

The term -- as -- as Ms. Badlam has explained, the term adulterated for purposes of this action means that Tris was not in compliance with FDA required current good manufacturing practices.

Absent anywhere in the State's petition or response to either of our motions to dismiss is any indication as to which CMPG (sic) Tris is alleged to have violated, unable to point to any particular CMPG that Tris allegedly violated.

What the State does is try to bootstrap this March 2018 FDA letter that Ms. Badlam referenced in which the FDA said that Tris's methods, facilities, or controls for manufacturing, processing, packing, or holding do not conform to CMPG.

Bootstrapping onto the FDA's CMPG finding, which could mean packing, holding, do not conform to any manufacturing process, doesn't give any indication as to what it is Tris did that caused the State's alleged violation or the cause of action asserted against it.

So unable to point to any specific rule, law, or CMPG that Tris allegedly failed to comply with, the State attempts to salvage its pleading flaw by referring to Tris's modification of its internal testing procedure for Quillivant.

The change in methodology, according to the State, is what rendered Quillivant adulterated. Not because it was ineffective, not because it was compromised, but because the change in the method and the testing methodology was not timely reported to federal or state agencies.

So, in other words, the State's adulterated argument comes down to and is premised on an alleged failure to timely notify or timely disclose the modification change to Texas Medicaid.

Nowhere, however, will you find any allegation that Tris had a duty to disclose, update, or even communicate with Texas Medicaid. In fact, Tris never communicated with Texas Medicaid regarding Quillivant. There was no duty to.

And the State's inability to allege that Tris had a duty to communicate with Texas Medicaid, much less update Texas Medicaid about its internal control methodology modification forecloses both as a matter of law, and, in fact, the State's ability to prove that Tris

violated the single section alleged against it, which is 36.0027. Therefore, this Court should dismiss Tris with prejudice from this case.

Thank you, Your Honor.

THE COURT: Mr. Bonilla --

MR. BONILLA: Can we get the cable for the -- thank you.

THE COURT: During your argument, Mr. Bonilla, I do need you to answer -- I would like an answer to that question of why the State continued to pay if they believed fraud was committed and it remained on the PDL, please.

MR. BONILLA: Certainly, Your Honor.

THE COURT: And I'll have a couple other questions, but you may proceed.

MR. BONILLA: Thank you.

So I just want to say at the outset that our response addresses each of these points in detail, so, you know, I'll have that.

I just want to put that out there that this is mostly nothing new, I'll say, with one exception, and that's kind of the question that you just asked about, which would, to my understanding, go to the element of materiality.

At no point in their -- in either of their

motions did they challenge our cause of action based on the element of materiality. It's just not part of this issue, this motion, and so we would object to the addition of that challenge to the causes of action.

To the point that you just asked for, I think on this idea that the State knew but continued paying for the drug, I think it's a disingenuous argument.

The allegations only go into 2018. That's the scope of our lawsuit, and what they're trying to say is some implication that we knew for this long time period and continued paying regardless.

The -- the issues of the quality control -- the quality control issues for Tris were not disclosed previously to the State, and, you know, once the State knew, we investigated. We filed a lawsuit. Here we are.

To the extent that counsel is trying to suggest that there are ongoing issues with Quillivant, we would be interested to know that. It's my understanding that these issues are not ongoing.

So continuing on now. So this is a case about whether Tris and Pfizer caused claims to be made for their adulterated schedule two ADHD medication Quillivant and whether Pfizer made false statements to

Texas Medicaid, which allowed it to receive the benefit of Quillivant's inclusion on the Texas Medicaid formulary and to receive unfettered reimbursement from the Medicaid program and ultimately damaging the integrity of the Medicaid program in the process by interfering with its decision making authorities.

Our case is brought under the Texas Healthcare Program Fraud Prevention Act, formerly known as the Texas Medicaid Fraud Prevention Act, or TMFPA. That's how we refer to it in the pleadings just by nature of when the unlawful acts occurred focused solely on the Medicaid program here.

The statute is designed to protect the people and the public by shielding the Texas Medicaid program from providers, including drug manufacturers who seek to defraud it.

This statute has its own set of unlawful acts, each with their particular statutory elements. I don't think it's accurate to call this strict liability. You have to meet the elements. They are certainly different from common law fraud.

Texas Medicaid is jointly funded by the state and federal governments to distribute the extremely limited dollars for vital health care for our State's most vulnerable citizens, and just by way of example, the

majority of Texas Medicaid recipients are children.

Before going further, I'd like to take a few moments to talk about how the Texas Medicaid program works to illustrate how defendants' conduct affected the integrity of the program and its decision making.

So federal Medicaid law requires each state to set up an administrative and fraud controls to administer their Medicaid programs, so it's set up at a federal level, and then states kind of have some freedom on how they handle the Medicaid program through their state.

In Texas for out-patient drugs, which is what we're talking about here, that's Vendor Drug Program, which we'll commonly refer to here as VDP.

Pursuant to the federal mandate, VDP set up an application system to have drugs added to the Texas Medicaid formulary, and Texas law also established the DUR board and P&T committee to further control Medicaid utilization.

So this leads to the VDP application, which defendants have talked about a bit now. This is a state law requirement that the VDP application is required to get inclusion on the Medicaid formulary. That's how reimbursement for a drug is authorized through this application.

This application includes descriptive information about the drug, requires submission of the FDA approval letter, FDA label, and, importantly, requires manufacturers to sign a certification.

The reason for the certification is because the Vendor Drug Program is staffed by just a handful of public servants charged with administering the formulary, the Medicaid formulary, of over, you know, 10,000 drugs.

VDP is completely dependent on manufacturers to give truthful and complete information about their drugs. They don't have the resources to go and chase down manufacturers and investigate each one. They're also dependent on manufacturers telling the truth on these applications and on the certification so that they can perform their federally required oversight function.

THE COURT: Are you saying that when they signed this in January of '13 that they had that information available?

Because what I saw earlier was it came up in June and September, six and eight months after they signed the application, so --

MR. BONILLA: Yes, we will -- we'll get there, but there's two responses to that.

The first response is that the application includes not just a certification that the product is not in violation, but it includes an ongoing duty to supplement if there's a change of certain information, including the product status.

It's the State's position and as pleaded that product status includes, as herein described, as -- as defendants point out, includes everything on the application, including the certification itself, and part of that product status would be that the product is not in violation of federal or state law, so --

THE COURT: Are you saying they didn't do it within the 15 days, or that they didn't do it at all?

MR. BONILLA: They did not do it at all.

THE COURT: All right.

MR. BONILLA: So that was -- that's our first response to that.

The second response is, as we will show you, there are portions of the pleadings that do allege that Tris was having -- that Tris was having issues with their dissolution testing, that they failed to thoroughly investigate these issues as they were required to, and that Pfizer was aware of this the entire time.

So VDP for their part can reject incomplete or untruthful applications, in which case

their drug would not be placed on the formulary. VPD can also review applications to determine whether to place restrictions on the drugs out of concern of safety, efficacy, or cost effectiveness, and in extreme cases, VDP can request removal of the drugs from the Texas Medicaid formulary.

THE COURT: Did they do this at any point on this drug?

MR. BONILLA: They did not, Your Honor. Again, that relates to the timing of the allegations.

THE COURT: All right.

MR. BONILLA: Switching to the DUR board and P&T committee, they were also established pursuant to federal and state law to monitor and control utilization.

The boards can -- it's the DUR board in particular -- can establish reimbursement restrictions called clinical edits that tell how reimbursement can occur for certain drugs to limit its uses.

The P&T committee monitors the preferred drug list, which allows certain drugs to be used without prior authorization.

In carrying out these functions, these committees review clinical information and receive testimony from drug companies and individuals from the community.

So this case alleges several unlawful acts concerning defendants' drug Quillivant.  Plaintiffs seek civil remedies and penalties for these unlawful acts, and there are several different categories of unlawful acts in the case.

Against Pfizer, the drug's owner, who had responsibility for promotion of the drug during this time period, plaintiffs allege they made misrepresentations to the Medicaid program in the form of a false certification to VDP on the application, as well as testifying to the Medicaid boards and failing to disclose that Quillivant had manufacturing issues affecting its potency, which could cause issues for patient safety and the drug's efficacy.

Against both Tris and Pfizer, plaintiffs allege that they caused Medicaid claims to be made for a product that was adulterated, which is an independent violation of TMFPA, Unlawful Act 7C, and this is where it starts to get complicated.

Adulteration is not defined in the TMFPA, but regarding pharmaceuticals, it has a specific meaning under state and federal law.  For instance, 21 USC 351A, part of the Federal Food and Drug and Cosmetic Act, lists out the ways in which a product can be adulterated, including failure to follow current good manufacturing

process regulations -- practice regulations, the CGMP's.

As alleged in this case, Tris, the manufacturer of Quillivant, was having trouble manufacturing the drug. Specifically early on, the product was failing these mandated quality control dissolution testing, which is to ensure that the drug was essentially releasing its ingredients as it was supposed to within required standards.

And this is a proxy for determining whether patients in taking the drug would be receiving a proper dose of the drug if taking it according to the approved directions, which is to say was the drug that was being made now meeting the same standards as when FDA first approved it. Here the answer was no.

But instead of fixing the manufacturing process that was causing these problems, Tris began modifying the test itself in the sample preparation methods, and this became a trend at Tris, changing the test method until they could get passing results on their quality control tests, all while keeping Pfizer in the loop of these changes.

Pfizer and Tris say the test methods can and do change, and while true, there is a proper way of doing that, and that process was ignored in this case, and you certainly can't use the changing of the testing

method as a way of getting your product into compliance.

And I'll just add on there this is not just a trivial violation. FDA itself found it to be problematic when they issued their warning letter.

Here, once FDA became aware that Tris had changed its test method, it issued a warning letter citing violations of CGMP and ordered Tris to revert back to the last approved method from back in -- I believe it was 2012.

As Pfizer noted, FDA involvement is important. They are the ones who found Quillivant to be adulterated, and the TMFPA in its unlawful acts does not require FDA to revoke the drug for it to be an unlawful act. The question, as we'll see in a moment, was the product adulterated.

All the while this was going on, Tris was releasing its adulterated product to Pfizer. Pfizer was promoting it throughout Texas, and patients in Texas were picking this up at the pharmacy.

Additionally, Pfizer, in applying to VDP to obtain Quillivant's inclusion on the formulary, falsely certified that it was not in violation of federal and state law and falsely certified that it would update VDP as to any change in product status.

And these lies allowed Pfizer to receive

the benefit of formulary inclusion. At no point did Pfizer inform the DUR board or P&T committee of the ongoing issues which further allowed Pfizer to avoid additional utilization controls.

Now, taking a step back a few points on the relevant law here, Tris's motion and most of Pfizer's motion challenge the State's claims as to having no basis in law. I think one of Pfizer's challenges goes to no basis in fact, at least that we could tell because they used the language of a reasonable person.

For deciding a 91A like this, the Sixth Court's opinion in Shire is precedential, and it says to find a no basis of law, the claim must be foreclosed as a matter of law because either, one, the causes of action in the petition are not recognized by Texas law or, two, the causes of action are recognized, but the plaintiff has alleged facts that defeat those claims under settled law.

At the outset, this is not a case where the cause of action is unrecognized. The TMFPA has been around for a few decades now, and nowhere do defendants say that the State has alleged facts that defeat its claims under settled law, as the Shire court requires.

Pfizer does try to say that we allege facts that defeat our own claims, and in doing so, what

they are essentially saying is that they dispute the conclusions that we come to, specifically with regard to the meaning of the VDP certification and whether their drug was adulterated.

You heard some of that just a while ago. That is not proper. They have to take the pleadings as alleged. If there is a legal dispute on it, you know, that is something they can point to a settled law. They don't do that here.

And the Shire court continues, thus a defendant cannot obtain dismissal under 91A on the pleadings where the defendant merely alleges the petition omits one or more allegations necessary to state the claim because this type of defect does not render recovery on that claim legally impossible.

And here's, I think, the main issue is that most of these are really just saying we don't plead adequately. The Shire -- the Sixth Court in Shire says that is not proper for 91A motion. Under this precedent, this type of 91A motion to dismiss can be denied without even getting to the underlying issues.

But to the extent we are here talking about fair notice pleading in Texas, the question is whether plaintiffs have provided adequate notice of the elements to allow an opposing attorney to ascertain the

nature of the claims, basic issues, and relevant testimony, and even omitting an element is not fatal where facts can be reasonably inferred from what is stated.

For no basis in fact, you look at whether a reasonable person can believe the pleadings. Doesn't even matter if it's likely, just whether it's believable, and this is noted by the court in Long v Long to merely be a point of contention due to be easily met.

THE COURT: All right. I agree with you on that, Mr. Bonilla, and I -- this question is probably out of -- the wrong hearing for that. But shouldn't the State at some point be required to give notice as to which CGMP that they had violated?

I mean, she indicated it's not stated in any -- anywhere in the petition. Shouldn't they be required to do that at some point?

MR. BONILLA: We will get to that in our presentation, and that's actually very much untrue that we don't indicate CGMP --

THE COURT: All right. Continue.

MR. BONILLA: And, finally, various Texas state court decisions made clear that 91A is not analyzed in the same manner as the federal 12B6. Additionally, Texas does not have a heightened pleading standard for

fraud, and the Sixth Court in Shire specifically rejects application and opposed strongly applying 12B6 case law to 91A.

And so moving then to the presentation, defendants challenge that the State did not adequately plead a CGMP violation. This is the first challenge of their four under 36.0027C, and this one goes to both Pfizer and Tris.

Not adequately pleading under the Shire precedent, this is not, again, a proper 91A challenge. The elements that we're looking at here, knowingly causing a Medicaid claim for a drug that has been adulterated are the development provisions.

There's a few more possibilities, but we're just focusing on the adulteration, and here they're challenging that third element, but plaintiffs have provided adequate notice, as the State will show you.

Starting with the Pfizer points to a federal FDCA case law to show that, you know, there's a certain way of doing it. There's no authority for the proposition that the federal FDCA case law is applicable to a TMFPA claim here, and specifically the third prong of TMFPA, unlawful act 7C, and so that just -- there's no authority for that.

So defendants challenge the adulteration

element. Instead of trying to prosecute FDCA adulteration, all we're doing here, we're saying that the State is pleading the drug was adulterated, and part of that is that the FDA itself found the drug to be adulterated.

Additionally, plaintiffs did outline the CGMP issue and articulated the conduct through which defendants violated the CGMP, so defendants' entire foundation for this challenge is false.

In this example, we have in paragraphs 21 to 23 cite to various provisions of the 21 CFR part 211, including 211.22A. This is quoted in our petition talking about the responsibilities of the quality control unit, which FDA later found lacking in their regulatory letters.

We cite 21 CFR 211.192 in paragraph 21, which talks about production control records. FDA found this one lacking as well in its later regulatory documents.

And then, importantly, -- and this is really key throughout this entire case -- is in paragraph 22 we cite 21 CFR 211.192, which requires thorough investigations of unexplained discrepancies, and this is what the FDA ultimately cited in their warning letter as saying that -- that it caused Quillivant to be

adulterated.

So these are cited there, in addition to 21 CFR 211.198 relating to patient complaints. The CFR there references back to the thorough investigation provision we just went over.

Later in the petition, we have citations to the FDA letters where they were calling out the various deficiencies of Tris in their letter to Tris, including the quality control unit, lack of responsibility. That's going out to the first CFR we looked at. The -- the procedures were not followed.

These are the very same CFR's we just looked at. FDA found these to be lacking after their investigation. FDA found Tris's test method changes to be improper as well in their drug and master file deficiency letter.

And then, finally, FDA issued a warning letter to Tris in 2018 finding Quillivant to be adulterated. In this letter, FDA, as you can see there, specifically noticed the finding of adulteration was based on 21 CFR 211.192.

So as the question you just asked, it is -- it is untrue that we did not provide this information in pleading our claims. All this was plainly cited in the petition and should be more than sufficient

to answer defendants' questions about the relevant CGMP's at issue.

But as an abundance of caution, in our response, we provided substantial details relating to the quality control failures. I don't think we need to go through each one of these specifically. They're all cited in the response, but we have pulled out all these portions of the petition.

The bottom line is that defendants failed to thoroughly investigate their quality control failures for Quillivant, patient complaints as well, and that led to CGMP violations and ultimately adulteration, and this is the meat of our case against Tris and Pfizer.

Because not just for dissolution testing, it covers -- again, there's a lot -- particle size testing; and like I say, we also, you know, wrap everything up at the end of each section and say that because of all this conduct we just talked about, defendants failed to conduct the investigations into the root cause.

I mean, it's -- it doesn't cite the CGMP here granted, but it does use the language that mirrors the CGMP, so there's no question what is being talked about.

Particle size testing, very similar

layout. We lay the conduct out that shows that these investigations were lacking, and the particle size issue was something that was going on and on throughout the -- the -- several years during these -- this time that they were having manufacturing issues.

And at the end, defendants' failure to investigate the specification test results constitutes an ongoing violation. It's this failure to investigate properly, and this continues for lack of compliance. We have a similar layout here as well.

The State has, therefore, adequately pleaded facts to permit defendants to put forth a defense on the issue of adulteration for Quillivant.

So the second part of this -- this challenge to 360027C relates to the issue of lack of authorization and materiality for -- just for this particular section, not everything in general, as -- as was discussed earlier.

You know, again, they point to In Re: Xerox. It talks about the plain language of the statute. They said that they were trying to bring the TMFPA in conformity with federal statutes, and the Xerox court actually addressed that, too, when it made the comment that the TMFPA and the False Claims Act, while they have some similarities between them, they use materially

different language.

And this one in particular, 360027C, is a good example of an unlawful act under the TMFPA that is materially different from the False Claims Act because the -- the False Claims Act does not have an unlawful act for causing a claim to be made for an adulterated product.

This is a very unique cause of action under Texas law, and it simply does not exist under the False Claims Act, so I'm not sure how we're trying to square that away, but the -- you know, the Xerox court says that you presume that the legislature did what they did for a reason.

We obviously know the legislature can write materiality and authorization like they did in 3600271. The use those words. Those are elements of that unlawful act. Here they chose not to, and -- and Xerox says we have to respect that, and Pfizer is essentially asking you to change the law, and the State would oppose such.

And this is not second guessing a decision to pay by Medicaid. This is conduct squarely fitting within an independent unlawful act that Pfizer and Tris violated.

Moving on now to their second challenge,

which goes to the falsity of the false statements, this is for 3600214B, and it relates to Pfizer only. For the next three of these, it's Pfizer only.

So Pfizer challenges plaintiffs' allegations on Pfizer's false statements on the VDP application, and this is the one that appears to be at least partly as to no basis in fact.

So, first, as we saw the -- as you saw earlier, the certification includes not just that there's no violation at the time, but there's a promise to update Medicaid, and failing to provide that update renders false certification and VDP application.

So that's -- that's the first part of it, that it's not just at this point in time, but that there is an ongoing duty.

The second part of it is that it is, in fact, untrue that the State doesn't allege any facts as to how Quillivant was adulterated prior to the VDP app, and -- and you can see some examples of that here.

Paragraph 44 talks about these issues even prior to FDA approval when Tris was struggling to achieve consistency with their drug. Almost immediately after FDA approval, and prior to the VDP application, Quillivant was -- began failing these quality control tests again.

So these are additional issues from paragraph 49, and the pleadings continue, rather than seeking to understand why the samples formed lumps during reconstitution, Tris retrained its analysts, and the pleadings state that put simply Tris's meager retraining was insufficient to prevent further out of specification dissolution test results.

This is an improper and lacking investigation along the lines that the CGMP says you do. So Tris's response to this October 2012 dissolution test failures was insufficient.

Now, there's other parts in the petition that would refer back to these CGMP's. The evidence shows that Pfizer was there with them when Quillivant was adulterated starting in 2012. This is not conclusory whenever it gets taken in conduct -- in context, rather, because Pfizer was aware of these. You saw in paragraph 64 that Pfizer's counsel showed you.

She didn't show you that Pfizer -- that when it was talking about those was -- was the -- the issues with the dissolution testing difficulty, meaning the test site, I believe is the exact language that Pfizer was aware of that. This is what we're talking about. This was the difficulty right here, that Tris was retraining instead of investigating the root cause.

So paragraph 64 that Pfizer pointed you to is a call back to the -- with context, this is what it's talking about, the October 2012 issues. Pfizer was in the loop on those.

So next Pfizer challenges the meaning of product status on the VDP application. They say that this is a self-defeating fact. Pfizer cites no settled law to say that this forecloses a claim based on the self-defeating fact. Shire court says that's a requirement for dismissing under 91A.

There's no settled law here. Pfizer just wants to -- to pick a definition for it and -- and not allow plaintiffs to -- to be able to obtain discovery on -- on the definition.

They should -- they're allowed to get discovery on the issue, but we can't just cut it off because they say it has a different meaning than what we say. That's a dispute.

Pfizer also ignores in this section that the certification refers to compliance with state and federal law that we talked about earlier, so the as herein described language is not contradictory because it is -- the application itself is part of what is being certified to. You can't just parse it out and say that this only applies to certain sections. Herein described

is the entire application.

And so I'll also say on the issue of the timing of adulteration that we had looked at, so this was the one about a reasonable person, the State submits that because of the -- the full pleadings that -- that we lay out on this issue, that it is absolutely possible for a reasonable person to believe that Quillivant was adulterated prior to the VDP application.

But, again, we also suggest that that's not a requirement because of the ongoing duty, and, therefore, these were false statements on the VDP certification.

And that takes us to 36002 sub two, which relates to concealment. This is another challenge that goes to the adequate pleading of our claims, and the Shire court says that this should be rejected outright.

So Pfizer says the State cites no regulation or law to show the obligation to disclose and that there's insufficient facts to show dissolution testing, comprised safety and efficacy during Pfizer's disclosure to the Medicaid boards.

The elements of 36002 sub two are listed up there, scienter concealing information permitting an unauthorized benefit. Pfizer in their motion talks about the word obligation and looks to the TMFPA definition.

It's worth noting that in 36002 sub two, the word obligation does not appear there, so as it's defined in the TMFPA, it's not part of this unlawful act. It was Pfizer who tried to write it into the statute, but -- but that should be kept out of it.

We're looking at just these three elements, and specifically their challenge appears to go to the third element about someone receiving an unauthorized or greater than authorized benefit.

In other words, whether the concealment affected authorization for a Medicaid benefit or a payment, if it did, then the TMFPA says it was an unlawful act.

As pleaded in the petition, the VDP application creates a requirement of disclosure to the mandatory certification. The VDP application's requirement of disclosure extends to the ongoing duty to submit changes to product status.

Again, we're talking about this several times now. This was something that Pfizer had to do to get their drug reimbursable with Texas Medicaid, and it is something that they did do.

And Pfizer failed to provide the required update to VDP regarding the product status, which permitted Quillivant to receive the benefit of continued

formulary inclusion and unrestricted reimbursement.

Regarding the DUR board, P&T committee, they make decisions on safety, efficacy, and cost effectiveness, and if they don't have the full information presented to them, they cannot effectively implement their reimbursement tools. Pfizer's concealment deprived them of this federally-mandated ability.

The DUR board receives information from drug makers and expects it to be truthful in order to carry out its duties, and that's pleaded at paragraph 38.

Pfizer chose to make presentations to the board but withheld this very relevant information about the failing quality control tests, the manufacturing issues. It prevented the boards from carrying out utilization of their duties.

And this -- this permitted Pfizer to receive the benefits they otherwise would not have been authorized to receive, that unrestricted reimbursement for Quillivant.

And to the extent Pfizer says it had no duty to disclose information to the board, Pfizer contradicts itself in the second part of this challenge where it acknowledges it does have the duty to disclose information on a drug's safety, efficacy, and cost

effectiveness, but they switched positions there and argued that plaintiffs didn't plead the quality control issues had such an impact.

We address this more fully in response, but due to the various quality control failures, insufficient investigations, Pfizer, through Tris, basically was unable to say whether their patients were receiving proper doses of Quillivant when they took it, which itself raises red flags of safety and efficacy.

They couldn't do that because the tests were being altered because they weren't investigating the manufacturing process. This was information that would have been important for Medicaid decision makers to know, as it's pleaded in the petition.

And, lastly, on the topic of scienter, Pfizer alleges that plaintiffs failed to plead that Pfizer acted with requisite scienter through the Eighth Court in the Maloof case.

The question is, was -- did the party know the relevant facts but did not care about the result, and we submit here per our pleadings that Pfizer did know the relevant facts and did not care about the results here.

In other words, Pfizer didn't have to know that Quillivant was adulterated. The question is did they have the relevant information about Quillivant yet

still undertake conduct that violated the TMFPA, and it all points the answer here is yes.

They knew of these issues very early on, October 2012, and instead of addressing the issues early on, it falsely certified to VDP. They continued to cause claims to be made for this adulterated product, and then it failed to update Texas Medicaid either VDP or the boards.

So, yes, as the pleadings will show, as listed out in our response, we have a bunch of slides on it here, it's the same as the response that Pfizer did know early on, but did not uphold its duty as it should have.

MS. BADLAM: Your Honor, may I just respond to just a few key points?

THE COURT: Yes, ma'am.

MS. BADLAM: Thank you.

THE COURT: Would you -- he indicated you didn't address materiality in your motion.

MS. BADLAM: Your Honor, yes, we did. It starts on page 32. Materiality is a -- a theme of our motion. It relates to -- it's a -- a driving theme in our motion. You can see it there. It starts on page 32. Specifically it's under introduction. It's -- it's throughout. That point I did want to address.

I also wanted to address the certification point and what is alleged in the petition because you'll see that plaintiffs put a number of the paragraphs up on the screen. They all talked about Tris.

The certification was Pfizer's certification, so they have to allege that Pfizer knew of the conduct. They can't just say that Tris did it and then somehow impute that knowledge to Pfizer. They have to allege that.

I also wanted to focus on product status. Product status, we're not making up the meaning of product status. It says product status is herein described, and there's certain sections specifically on product status within the VDP application itself.

Also, there is some guidance on what product status means both in FDA documents and actually in HHSC documents. HHSC, there's a specific document that uses the term product status and refers to drugs, FDA approval status or classification, which is -- mirrors what's in the VDP application itself.

The -- the adulteration piece I just wanted to touch upon quickly. So what -- what they showed you on the screen -- and it's in the petition -- is in the background section there's a number -- they basically cite 21 CFR part 211, which is all of the regs

at that specific section, and they just start citing different CGMP regulations.

What they don't do -- and you can actually see it in the -- in the paragraphs Mr. Bonilla put up on the screen. They don't actually cite which regulations relate to the given sections and how the conduct actually violated those given regulations, and that's the problem with how that's pled.

Mr. Bonilla said numerous times that this -- this matter is about failure to investigate. The failure to investigate is the meat of their case; right? Not safety and efficacy, not how the drug worked, not how it had an impact on safety; right?

And they're saying that we're trying to change the law. We're actually arguing that they're trying to change the law. They're trying to use a fraud statute to say that a technical CGMP violation related to investigation somehow makes the product defective and needs to be withdrawn from the State of Texas.

A number of our arguments -- there's a lot of talk about the Shire case. The bottom line is that their causes of action are foreclosed as a matter of law.

We're not arguing about facts. We understand take all the facts as true. But even when you take the facts as true, they are foreclosed as a matter

of law.

We talked about the timing problem with the VDP application as one of the issues and also about the authorization particular issue, which is the cause of action based on disclosure.

That entire provision is based on the idea that had Texas Medicaid known about the issues, they would have revoked authorization, which they did not. I know you asked Mr. Bonilla about that specifically to begin with.

The issues were public in 2018. This was a very public issue; right? It was out there in the public. It was in papers, and it was on FDA warning letter. This was out there, yet Texas did not revoke authorization.

I think those are the main -- the main points that I wanted to make. I think, you know, one through three -- the causes of action one through three are foreclosed as a matter of law.

We allege adulteration is not pled. It is not clear. It is not -- it's not clear what specific CGMP regulations apply to the sections, how we violated those regulations, and then the big question -- and it's a big question -- is what that means in the materiality piece in this whole case.

Can you say that conduct technical CGMP violations that have no impact on the product safety and efficacy is a basis for our fraud action? We would argue no. This is just a gotcha case.

Thank you, Your Honor.

THE COURT: Mr. Howell.

MR. HOWELL: Just very briefly, Your Honor.

As -- as Mr. Bonilla made clear, the entire -- the State's entire case against Tris relies upon information provided in and certifications required in the VDP application.

So absent a VDP application by Tris, the State's case against Tris and the alleged failure to investigate, which is a violation of current good manufacturing practices, falls apart.

And the fact of the matter is Tris never -- Tris never submitted. Tris never signed a VDP application. Tris never made any certifications with respect to Quillivant.

So absent that document and absent those obligations, the State really cannot -- it's factually legally impossible for the State to allege, let alone prove, that Tris violated the section they are asserting they violated.

Thank you, Your Honor.

MR. BONILLA:  May I respond?

THE COURT:  Yes, sir, Mr. Bonilla.

MR. BONILLA:  Just real quick as to the Tris itself, we have only one unlawful act against Tris, which is 360027C.

It's not related to false statements on the VDP application.  It's just the adulteration causing claims to be made from an adulterated product.  That has no -- no involvement of the VDP application there because it's not talking about false statements at all.

To the extent that materiality is -- we're talking about materiality, she pointed to -- opposing counsel pointed to page 32, which is specific to 36.0027C, the adulteration section, unlawful act, which does not have a materiality standard.

So if that's what she's talking about and when she talks about materiality, you know, understood, my understanding from her argument earlier was that it was a broader materiality argument related to payment by Texas Medicaid being authorized or not.  Again, that is not any portion of 360027C, and that's the one where the Xerox case says you look at how the statute is written, and you interpret it as such.

We do cite the specific adulteration --

the CGMP provisions that we showed earlier. Those are cited as footnotes. It very clearly lays out the conduct at issue.

Just wanting to go back, you know, this is fair notice pleading. We're not having to prove our entire case here. It's just are they on notice of the basic issues that we're talking about here of their defenses of testimony that will be relevant.

This is -- fair notice pleading in Texas is a low bar, and I think the very fact that we're having this conversation shows that they are -- they submitted a very lengthy response that details all the issues at play here. I think we're -- we're all on the same page as to what this case is about.

And then the product status issue, you know, they -- they point to different context. They don't point to a definition of product status in the VDP application. It might be subject to two different interpretations. It's our understanding that product status includes whether a drug was in violation of federal or state law, and that's how we pleaded in this case.

And then the relationship between Tris and Pfizer, we do point to some things that Tris did the evidence itself shows, and we've pleaded that Pfizer was

right along there with them understanding these things.

They were partners in this -- this drug manufacturing and promotion. They kept each other in the loops. Pfizer had a person on the inside at Tris's plant, and they certainly knew what was going on, even prior to the VDP application.

Thank you.

MS. BADLAM: Your Honor, my last point, and I promise I'll stop.

It's just page two of our motion. We have -- we do have a materiality argument. It specifically says indeed despite the public nature of conduct underlying the allegations of petition, including an FDA warning letter to Tris on March 26th, 2018, that was widely reported in the press and more than a three-year investigation by the attorney general's office, the Texas Medicaid has never removed Quillivant from the preferred drug list since it was officially added in 2014. It's consistently paid for prescriptions of the product.

MR. BONILLA: I mean, that's not a challenge to any particular cause of action. That's background.

THE COURT: All right. Have you each filed your orders in both these cases?

MR. BONILLA: Yes, Your Honor.

MS. BADLAM: Yes, Your Honor.

THE COURT: Okay. I didn't have them in my queue. I can see the motions themselves, but --

All right. Then I will get you a ruling before the end of the week.

MR. BONILLA: Thank you, Your Honor.

MS. BADLAM: Thank you, Your Honor.

THE COURT: If there's nothing further, you are excused.

MR. HOWELL: We have one more motion to dismiss, a cause of action that's Cause No. 23-1030.

THE COURT: All right. I guess we'll proceed with that.

MR. HOWELL: This one is much, I think, less complicated. I'm the only one who is on this one.

So switching gears, Your Honor, now we're -- we're on Cause No. 23-1030, and this hearing is on Ketan Mehta's 91A motion to dismiss, him individually, from the case.

This case is about alleged actions or inactions of Tris with respect to compliance with regulatory provisions that even the State concedes are applicable exclusively to drug manufacturers like Tris, but not to individual executives of drug manufacturers

like Mr. Mehta.

So as we're going to go through all of the duties, obligations, certification requirements, that the State alleges were violated, to the extent that they were violated, they could only have been violated by a drug manufacturer, which would be Tris, but not by an individual.

So as we'll discuss in more detail, the State's own allegations and concessions make it facially, legally, and factually impossible for the State to sufficiently plead, much less prove, either of the two causes of action asserted against Mr. Mehta.

And there's three causes of action total, two of which are asserted against Tris and Mr. Mehta, one of which is asserted just against Tris.

So just some brief background that I think will be short, but will be helpful, Mr. Mehta founded Tris Pharma in 2000, currently serves as the company's chief executive officer.

Mr. Mehta has dedicated his entire professional career researching and developing cutting edge pharmaceutical products.

Tris, which is headquartered in Mr. Mehta's home state of New Jersey, is a privately-held biopharmaceutical development company committed to

developing and delivering effective and unique therapies to any patients suffering from, among other things, but primarily Attention Deficit Hyperactivity Disorder or ADHD.

Today Tris employees over 500 people, and importantly, even though it's been in business for 25 years, Tris has never been accused of selling -- producing or selling a contaminated or tainted drug. It's never received a single complaint about any of its product being contaminated or tainted, Dyanavel or otherwise.

In addition, despite the State's allegations, Texas has never removed Dyanavel from its Medicaid formulary or, as we discussed the importance of in the prior hearing, the preferred drug list.

So we're not here today, Your Honor, because of patient harm or potential patient harm, whether in Texas or elsewhere. Instead, plaintiffs complain about the branding and labeling of one of Tris's ADHD drugs, which is Dyanavel XR.

It's an extended release oral suspension amphetamine-based medication that's designed to gradually release the active drug ingredient over the course of a day so that a patient can take a dose one time in the morning and then not have to worry about remembering or

being distracted by taking additional doses throughout the course of the day.

The essence of plaintiffs' complaint is that Tris promoted Dyanavel as having a 30-minute onset when the FDA approved label stated that Dyanavel had a 60-minute onset.

For purposes of Mr. Mehta's motion to dismiss, however, it is absolutely irrelevant what Tris failed to say or -- or said about Dyanavel's onset time because the basis of any cause of action asserted against Mr. Mehta relies, again, on certifications and duties and obligations that are incumbent exclusively upon drug manufacturers, not on individuals such as Mr. Mehta.

Plaintiffs do not and cannot sufficiently allege either of the causes of action against Mr. Mehta because, one, the State concedes that -- and we'll walk through it. The State concedes that all the rules, regulations, and statutes that plaintiffs claim were violated apply exclusively to drug manufacturers and drug companies, which Mr. Mehta is not.

The State also concedes that Tris did not begin to promote Dyanavel's 30-minute onset until after Tris had received a clinical research study that substantiated the 30-minute onset, that Tris then provided the clinical study and its results to Tris's

Promotional Review Committee to decide whether the 30-minute onset could be included in Tris's -- Dyanavel's promotional materials.

And I think it's important to note, Your Honor, that Mr. Mehta may be the CEO, but when it comes to deciding what information can be included in any of the Tris drug promotional materials, that authority is exclusively onto the Promotional Review Committee.

The PRC decides whether a piece of information can be included or excluded, and in this case, the PRC took a look at the study that had been conducted, the test results from it, and decided that it approved including the 30-minute onset in the Dyanavel promotional materials.

Finally, plaintiffs -- plaintiffs don't make a single allegation as to what Mr. Mehta did. Mr. Mehta is separate from Tris, but what Mr. Mehta did that would give rise to or even remotely relate to the causes of action asserted against him.

So, again, so the two causes of action that the State asserts against Mr. Mehta claim that he knowingly made or caused to be made false statements to Texas Medicaid in applying for Dyanavel's inclusion on the Vendor Drug Program formulary and during Texas Medicaid utilization review and referred drug list

processees.

Yet, the plaintiffs specifically state that defendants, not Mr. Mehta, but that defendants falsely certified that Dyanavel was not in violation of federal law and that Tris would update Texas Medicaid as to any change in Dyanavel's product status.

Secondly, the State alleges that Mr. Mehta knowingly made, caused to be made, induced, or sought to induce, the making of false statements or misrepresentations of material fact.

And, here, plaintiffs claim that, again, during the Vendor Drug Program application process, defendants, not Mr. Mehta, but defendants falsely certified that Dyanavel was not in violation of federal or state law and that Tris, not Mr. Mehta, but Tris would update Texas Medicaid as to any change in Dyanavel's product status.

Plaintiffs' claims are implausible on their face because Mr. Mehta did not and legally could not provide the certification relied upon by the State because Texas Medicaid requires and will only accept certifications from drug manufacturers or drug companies.

In fact, we saw -- when we put the VDP application up there on the last hearing, it says at the very top it is -- it's the drug manufacturer that's

providing the information and certifying to continue to provide updates to the extent necessary.

This is why nowhere do plaintiffs allege what Mr. Mehta, as opposed to and distinct from Tris, but what Mr. Mehta did or failed to do that gives rise to either of the two causes of action the State alleges against him.

The State complains that at the time Texas added Dyanavel to its Medicaid formulary and Preferred Drug List, Dyanavel's FDA approved label stated that Dyanavel's onset time was 60 minutes, but that the defendants, again, not Mr. Mehta, the defendants promoted Dyanavel's onset time as 30 minutes.

At the same time, the States acknowledges that shortly after Dyanavel was approved by Texas Medicaid, Tris commissioned a clinical study, the results of which Tris received on March 21, 2017, that showed statistical significance of Dyanavel's 30-minute onset.

Now, the important -- the important point here, Your Honor, is that Tris did not begin promoting 30-minute onset until after three things had happened, a clinical study that provided statistical substantiation of 30-minute onset was provided to Tris.

Tris provided that to its -- to its Promotional Review Committee. The Promotional Review

Committee approved including the 30-minute onset data in Tris's promotional -- I'm sorry -- Dyanavel's promotional materials.

Mr. Mehta had nothing to do with any part of that process. Mr. Mehta is the CEO, so, you know, the State can allege that ultimately the buck stops with him, but that doesn't give rise to a legally cognizable cause of action.

The State further acknowledges that Tris -- Tris did not begin promoting the 30-minute onset until May 2017, so that's after the -- that's after all of the other actions have been taken, the study had been concluded, and the PRC had approved including the 30-minute onset data.

What the State tries to do is take issue with the type of clinical study based upon which Tris's Promotional Review Committee approved the 30-minute onset data, and here the State claims that the study is somehow invalid because it only showed statistical significance based on a subjective component, but did not show statistical significance based on an objective component.

Now, if you take a look at the NIH descriptions of the two types of tests that are being talked about, there's absolute inherent subjectivity in -- in either one of them because short of being able

82

to crawl into, you know, the central nervous system of one of the test subjects and observe firsthand when the drug begins to take effect, what we're relying on is observers, some teachers, lab technicians, watching in this case children and evaluating when they think the drug is beginning to take effect, marking that, and then that's the basis of -- of the onset determination.

So under either test, there's inherent subjectivity, but the fact that the tests are subjective does not in any way, shape, or form give rise to a cause of action under the Texas Medicaid Fraud Prevention Act.

So the State's two causes of action against Mr. Mehta are precluded and foreclosed both legally and factually by plaintiffs' own allegations and concessions.

The State repeatedly refers to Tris and -- and Mr. Mehta as the defendants throughout the petition and in its response, but fails to ever explain even to a degree that would satisfy the -- the -- Texas' liberal notice of pleading standard what Mr. Mehta, as opposed to Tris, did that would give rise to either of the two causes of action.

Secondarily, Your Honor, plaintiffs cannot establish liability as to Mr. Mehta because, as I mentioned before, the State concedes that any alleged

duty to report, disclose, or certify any of the information regarding Dyanavel was an obligation incumbent exclusively upon Tris, the drug manufacturer.

For example, the State recognizes that in order for a drug to be included in Texas' Medicaid Vendor Drug Program formulary, the drug company or manufacturer must file an application with the -- the Vendor Drug Program.

The State concedes that the Texas Medicaid requires drug manufacturers to include certain information in the VDP application.

The State further acknowledges that Texas Medicaid requires drug manufacturers to certify that all the information provided in the application is correct and that the drug is not in violation of federal or state law.

Finally, the State concedes that by submitting the VDP application, drug manufacturers accept an ongoing duty to timely notify Texas Medicaid of certain changes to the information contained in the VDP, and the State alleges -- the State even explains that manufacturers owe a continuing duty to Texas Medicaid to supplement the information.

None of those obligations are incumbent upon Mr. Mehta. They are exclusively the obligations of

the drug manufacturer, which in this case obviously would be Tris.

The State, therefore, has conceded that the relevant -- that the relevant reporting and updating certification duties and obligations that are incumbent exclusively upon drug manufacturers have nothing to do with any obligation of Mr. Mehta.

Fatal to plaintiffs' causes of action against Mr. Mehta is the fact that none of the duties, again, render Mr. Mehta -- and the State does not allege any action or inaction by Mr. Mehta that gives rise to or quite frankly even relates to the causes of action -- the two causes of action asserted against him.

Lastly, the State acknowledges that Texas Medicaid continuously monitors and manages its drug formulary through the Texas Drug Utilization Review Board, and in order to fulfill their duty and oversight function, the DUR board frequently receives information from drug manufacturers, including defendants, and I'm quoting from the petition.

The State alleges that DUR board frequently receives information from drug manufacturers, including defendants. Here, plaintiffs have sued two defendants, Tris and Mr. Mehta. One of them is obviously a drug manufacturer, Tris. One of them is not, Mr.

Mehta.

Yet here the State groups them together claiming that they are both drug manufacturers, and, therefore, have the exact same reporting duties and obligations under the Texas Medicaid formulary and VDP application.

The Texas Medicaid -- the drug -- the Drug Utilization Review Board very well may have received information from Tris, but it never received any information from Mr. Mehta, nor did it ever have any communications with or correspondence with Mr. Mehta.

The Court should, therefore, disregard all of the State's allegations that attempt to impute to Mr. Mehta the duties and obligations that apply exclusively to drug manufacturers, such as Tris.

And in conclusion, Your Honor, I will recognize that a Rule 91A motion is infrequently granted, but here it seems difficult to imagine a scenario in which dismissal, at least as to Mr. Mehta, could possibly be more warranted.

Based on the meandering conclusory at times self-contradicting nature of the allegations as to Mr. Mehta, for example, where he's referred to as a drug manufacturer, it would seem as if plaintiffs decided almost as an afterthought to include him as an individual

defendant.

The practical reality, Your Honor, is that including Mr. Mehta as an individual defendant adds nothing to the State's case, just as dismissing him takes nothing away from the State's case.

The State's case is against Tris. Plaintiffs' petition relies entirely on Tris's actions or inactions, and every regulatory or statutory provision alleged to have been violated could only have been violated by Tris, not by Mr. Mehta.

The State's own allegations and concessions, therefore, render it legally and factually impossible for the State to sufficiently plead, let alone prove, either of the two causes of action is asserts against Mr. Mehta. We request, therefore, that this Court dismiss Mr. Mehta with prejudice.

Thank you, Your Honor.

THE COURT: Mr. Bonilla.

MR. BONILLA: Thank you, Your Honor.

THE COURT: I will tell you, Mr. Bonilla, I had a hard time -- I sided with you on the special appearance, but I had an issue with this, so I thought this was against farther pharmaceutical companies, so proceed, please.

MR. BONILLA: Sure, yes. And -- and we

will explain that.

So the -- the second case is about whether Tris and its CEO Ketan Mehta caused to be made false statements to Medicaid for their other schedule two ADHD drug Dyanavel, allowing it to receive the benefit of inclusion on Medicaid formulary and unfettered reimbursement, which is similar to what we had just talked about.

So this -- this is a case about false statements made to Medicaid both at the decision makers and its Medicaid providers. We also talk about direct misrepresentations here to the Medicaid providers around Texas, and it's similarly -- similarly brought under the TMFPA.

So earlier I outlined the background of the Medicaid program. For purposes of this case, that is all the same. I'm not going to go over it again.

The one exception is that the P&T committee got rolled into the DUR board, so the DUR board at this point in time controls the PDL as well.

So at issue here, plaintiffs have alleged that Tris's CEO Ketan Mehta caused several categories of false statements to be made, and this includes the VDP certification, the false statements to the DUR board, and then those direct misrepresentations to Medicaid

providers in violation of 36002 one and 4B.

And now the key here, the -- the word that I wanted to focus on there that I think answers at least some of your questions is that this is -- this is caused to be made.

Under the TMFPA, you can make a misrepresentation or you can cause to be made a misrepresentation. We would assert that if Tris were here, we would be talking about Tris making the misrepresentations.

For Mr. Mehta, under the statute, which is part of the unlawful acts for both one and 4B, he's causing these to be made through his actions at Tris, and so that's the key that I think was missed on -- on opposing counsel's opening.

Specifically, the CEO Mehta, in effort to differentiate and gain market share for his companies, then new product, the ADHD drug Dyanavel, which is a pediatric amphetamine, he personally pushed for Tris to start using these false statements in their marketing of DXR, Dyanavel.

And, again, this is the key here within our -- our pleadings, which we'll get to in a little bit. You know, he is the CEO. Tris is a relatively small pharmaceutical company compared to other CEO's.

I don't know much about Pfizer. They're much larger. I don't think their CEO is in the trenches, you know, working with product messages and studies and so forth. Here Mr. Mehta was doing that. He's --

THE COURT: What does the State gain by having him in the lawsuit, Mr. Bonilla?

MR. BONILLA: It -- you know, I don't think that we necessarily have to justify why he's in the lawsuit for purposes of this motion.

THE COURT: I understand that. I just -- I'm looking down the road here. I mean, if his conduct -- you're still going to discuss his conduct or present it to the jury if the case moves forward. It's going to be his conduct on behalf of the company. I mean, I --

MR. BONILLA: Understood. The allegations about Mr. Mehta's conduct are what lead to this issue that we're talking about. He was the one pushing for these misrepresentations to happen, and we feel that the way that he was pushing his conduct to go through Tris, using his leverage as CEO to get these messages included in the core visual aid, that -- that this was significant, his role in this case.

THE COURT: All right.

MR. BONILLA: And these false statements

included broad claims of the 30-minute efficacy, 30-minute onset, which means, in effect, that Dyanavel start working twice as quickly as it is indicated to work, which would give it a leg up over all the established drugs already in this space, including Quillivant.

And it would help them gain market share in the process, and there were also claims of efficacy that are included in the petition, including improving patient functionality and helping patients reach their full potential.

Both Mehta and Tris, though, knew that these were not true claims. Yet they had their sales force trained on and deliver this messaging to doctors throughout Texas, including Medicaid doctors, causing the drug to be misbranded under the FDCA.

That's the other difference here. Before we were talking about adulteration. Here we're talking about misbranding. It has its own set of CFR's and unlawful acts and FDCA that we will take a look at.

There's a number of ways that you can misbrand a drug, having labeling that is untrue in any aspect is one way. Disseminating false advertisements about the drug is another way, and both of those were in play in this case.

And, finally, Mr. Mehta caused false statements to be made in testimony to the Texas Medicaid DUR board in violation of the law.

So, again, going to the legal standards here, very similar as last time. You know, I'll bring up the Sixth Court's opinion in Shire relating to 91A that this -- says that when we're talking about inadequate pleading, that is not a legal impossibility.

Every one of Mehta's challenges here seeks to dismiss the State's claims for insufficient pleading, and you can see that on page three where he outlines one through four of the challenges they're making.

Plaintiffs failed to plead facts sufficient. It is common between all of those. The Shire court says you can't do that with a 91A, and that's enough to defeat the motion.

Simply put, the State's case here is not the type of baseless case that 91A seeks to keep off the court's dockets. Otherwise, standards are very similar as before with fair notice pleading.

So going to the first point that Mehta is not a liable party for purposes of the causes of action, that sounds like that's kind of saying that he didn't cause these claims to be -- these false statements to be made. Mehta -- that there's insufficient allegations to

show that Mehta, as opposed to Tris, caused the false statements to be made.

We don't need to look to the federal standards here. They cite the federal -- federal cases on their -- their pleadings. The Texas Fair Notice Pleading Standard just asks for the basics issues of the controversy and relevant testimony. That's In Re: Allstate case.

And at a high level, the allegations here show that Mehta himself, CEO Mehta, was the driving force behind the false statements to doctors, as well as getting Dyanavel added to the Medicaid formulary, and that is what's pleaded in the petition and what was not presented on the opposing counsel's introduction.

The State's allegations plainly point to Mehta as causing the false statements to be made to Medicaid decision makers, too, that the CEO Mehta was directing this to happen to get the drug on formulary.

This time it was Tris submitting the application, as opposed to last time it was Pfizer. Again, Mehta is a hands-on CEO, was involved there as well. This is in the pleadings.

Submission of the VDP certification was false the statement to Texas Medicaid caused by CEO Mehta, and the false statements to the DUR board, which

are described in detail elsewhere, are also linked to Mehta in the petition.

THE COURT: You need to wrap it up, please, Mr. Bonilla. I've got another hearing at 3:30, so --

MR. BONILLA: Oh, my apologies, Your Honor.

So regarding the false statements delivered by Tris sales reps, the State alleges that Mehta had his hand in the process throughout, and this is where we did a number of allegations in the petition outlining exactly how he did that, by -- by being the cause of these claims to be made, the study itself.

He pushed it through the Promotion Review Committee to make sure that it was used. It was his dream, and he wanted to see to it that that got implemented in the field. We also include Mehta's understanding of the study didn't show what they wanted it to, but he was using it anyways.

And this is additional details that Mehta pushed the 30-minute onset claims. He's made it into the core visual aid, which sales reps were told to use on every call.

And then plaintiffs also give fair notice on the other efficacy claims alleging that Mehta caused

those to be made as well.

While admittedly much of the conduct is directed at Tris, there is sufficient detail to permit Mehta to understand how the State is linking him to these allegations.

We're not saying that he's a drug company or that he was the one making the statements. It was his direct that caused these to happen, and we outline that in our petition.

And he was this hands-on CEO directly intervening in the company to get what he wanted from the company, and that's how these claims got made.

Turning to falsity, which is the next real point of contention here, the -- the argument here is that the -- that the State can prove falsity under this -- the federal standard that is put forth of securities law.

The State states that you should reject that and instead look at Texas law for definition of falsity, and the Fourteenth Court of Appeals here says representation is false if it consists of words or other conduct that suggest to the plaintiff that a fact is true when it's not.

This accounts for a lesser definition of knowingly, including reckless disregard. In other words,

saying something is true when you don't have enough information to know it's true can still be a false statement. You don't have to know for sure that something is -- is false.

THE COURT: You cited this case in the response to the special appearance.

MR. BONILLA: Yes, sir.

Sorry, for the special appearance, I don't believe we did. Oh, in this response I believe we did -- or I'm certain we did, rather.

So there's two categories of falsity, the VDP certification and the claims of efficacy. There's no -- no citation of civil law suggesting that this is contradictory.

Mehta in his motion tries to say that the fact that the -- we describe the study results as mixed means that we can't say that it was a false statement, but really going out and promoting a claim of 30-minute onset, that itself suggests that Tris, at the direction of Mehta, had the proper support to make that claim, which was false, since the study did not prove that claim.

FDA said the study was not able to prove that claim even if the study came out completely in their favor, which it did not. This study -- this study that

we're talking about was insufficient to support a broad claim of 30-minute onset, and so that's how that was false.

This -- the study limitations were not conveyed to Texas doctors by the sale force, contributing to the falsity, and then there were the other additional claims of efficacy that were noted as being false by virtue of FDA letters in Tris's possession.

They knew this. They promoted those anyways, and through the delivery of these false efficacy messages, Dyanavel became misbranded in violation of federal or state law, and yet no update was provided to Texas Medicaid pursuant to the certification rendering that false in a similar manner that we had talked about before, so the State has adequately pleaded.

There were two more challenges to this -- in these cases. I think these two were very -- very simple and self-explanatory, so I'm not going to go over these.

But I just want to urge you again, Your Honor, what we're talking about here is not Mehta making statements, but it's causing to be made through his hands-on conduct as the CEO.

Thank you.

THE COURT: All right. Thank you,

counsel.

MR. HOWELL: Just very briefly, Your Honor.

Based on the State's position, any CEO that's, quote, hands on or involved in -- in operations and activities and driving products to market can be held liable under -- under the Texas Medicaid Fraud Prevention Act.

I mean, what -- what I hear the State saying is, well, the degree -- it depends upon the degree of the CEO's involvement; right, to determine whether the CEO can be held personally liable.

If -- if that's the case, well, then the -- all the members of the PRC could be held liable for approving the 30-minute onset based on what the State claims is a faulty test result.

The fact of the matter is the causes -- the two causes of action that the State has asserted against Mr. Mehta are designed and -- and driven towards pursuing drug manufacturers and drug companies. That's why the certifications all refer to drug manufacturers and drug companies.

That's why it's Tris's obligation to update VDP if there's any -- update Texas Medicaid if there's any changes in the product, as described in the

VDP.

So, again, Mr. Mehta cannot be held liable under the causes of action asserted against him; therefore, Your Honor, he should be dismissed.  The case will go forward.  Let's fight it out with Tris.  Tris is the one they're after.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. BONILLA:  Thank you.

THE COURT:  Thank you again, counsel.

With that, if there's nothing further, you are excused.

(Hearing adjourned.)

STATE OF TEXAS          )

COUNTY OF HARRISON    )

I, Tammy L. Goolsby, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this 14th day of June, 2024.

**/s/ TAMMY GOOLSBY**_____
Tammy L. Goolsby, CSR
Texas CSR 3101, Expires 7/31/25
Official Court Reporter
71st Judicial District Court
200 W. Houston, Suite 219
Marshall, Texas  75670
Telephone 903-935-8407

**Tab B: Order Denying Defendants' Joint Motion to Amend Previous Orders and Certify for Interlocutory Appeal**

Filed 10/10/2024 2:38 PM
Sherry Griffis
District Clerk
Harrison County, Texas

Marcia Bayer
Deputy

CAUSE NO. 23-1031

| | | |
|---|---|---|
| THE STATE OF TEXAS<br>*ex rel.* TARIK AHMED | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 71ST JUDICAL DISTRICT |
| | § | |
| PFIZER INC., TRIS PHARMA, INC., | § | |
| And KETAN MEHTA | § | |
| | § | |
| *Defendants.* | § | HARRISON COUNTY, TEXAS |

## ORDER DENYING DEFENDANTS' JOINT MOTION TO AMEND PREVIOUS ORDERS AND CERTIFY FOR INTERLOCUTORY APPEAL

CAME ON THIS DAY to be heard in the above-numbered and styled cause *Defendants' Joint Motion to Amend Previous Orders and Certify for Interlocutory Appeal*. The Court, having considered said Motion is of the opinion that it should be DENIED in all respects. It is therefore:

ORDERED *Defendants' Joint Motion to Amend Previous Orders and Certify for Interlocutory Appeal* is DENIED in all respects.

SIGNED this _____10_____ day of _____Oct_____, 2024

_____
HONORABLE JUDGE BRAD MORIN

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 92230757
Filing Code Description: ORDER
Filing Description: Order denying Ds Jnt MtnAmend Previous ORDSCertify for Interlocutory Appeal
Status as of 10/17/2024 8:27 AM CST

Associated Case Party: PFIZER INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Edward Burbach | 3355250 | eburbach@foley.com | 9/19/2024 2:38:55 PM | SENT |

Associated Case Party: THE STATE OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mary JoToupin | | maryjo.toupin@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |
| Janice Garrett | | Janice.Garrett@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |
| Jonathan D.Bonilla | | Jonathan.Bonilla@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |
| Brittany Peters | | Brittany.Peters@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |
| Jordan Underhill | | Jordan.Underhill@oag.texas.gov | 9/19/2024 2:38:55 PM | SENT |

Associated Case Party: TARIK AHMED

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jason T.Brown | | jtb@jtblawgroup.com | 9/19/2024 2:38:55 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 9/19/2024 2:38:55 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 9/19/2024 2:38:55 PM | SENT |
| E. GlennThames | | glennthames@potterminton.com | 9/19/2024 2:38:55 PM | SENT |

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janice Garrett on behalf of Jonathan Bonilla
Bar No. 24073939
Janice.Garrett@oag.texas.gov
Envelope ID: 92230757
Filing Code Description: ORDER
Filing Description: Order denying Ds Jnt MtnAmend Previous ORDSCertify for Interlocutory Appeal
Status as of 10/17/2024 8:27 AM CST

Associated Case Party: TRIS PHARMA, INC.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry L.Gillam | | gil@gillamsmithlaw.com | 9/19/2024 2:38:55 PM | SENT |
| Tom Gorham | | tom@gillamsmithlaw.com | 9/19/2024 2:38:55 PM | SENT |
| Barrett ReidHowell | | barrett.howell@blankrome.com | 9/19/2024 2:38:55 PM | SENT |
| William E.Lawler, III | | william.lawler@blankrome.com | 9/19/2024 2:38:55 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stefan Schropp | | Stefan.Schropp@ropesgray.com | 9/19/2024 2:38:55 PM | SENT |
| Samantha Barrett | | Samantha.Badlam@ropesgray.com | 9/19/2024 2:38:55 PM | SENT |
| Val Jones | | val@valjoneslaw.com | 9/19/2024 2:38:55 PM | SENT |

**Tab C: Transcript of Motion to Amend Hearing, January 27, 2024**

CAUSE NO. 23-1031

THE STATE OF TEXAS ex rel ) IN THE DISTRICT COURT
TARIK AHMED                )
                           )
vs.                        ) HARRISON COUNTY, TEXAS
                           )
PFIZER, INC., TRIS         )
PHARMA, INC., AND          )
KETAN MEHTA                ) 71ST JUDICIAL DISTRICT

_____

MOTION TO RECONSIDER

_____

On the 27th day of January, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE BRAD MORIN, Judge Presiding, held in Marshall, Harrison County, Texas:

Proceedings reported by computerized stenotype machine, Reporter's Record produced by computer-assisted transcription.

**P R O C E E D I N G S**

(January 27, 2025)

4:20

THE COURT:  Court's going to call 23-1031, State of Texas versus Pfizer, Tris Pharma, and Ketan Mehta.

Announcements for the record, please?

MS. BADLAM:  This is Samantha Badlam on behalf of defendant Pfizer.

MR. GILLAM:  Your Honor, Gil Gillam, also Barrett Howell, Bill Lawler, Chris Caudill, and Huaou Yan on behalf of Tris Pharma.  We're ready to proceed.

MR. BROWN:  Good morning, Your Honor. Jason T. Brown from Brown, LLC., on behalf of the relator.

THE COURT:  All right.

MR. UNDERHILL:  This is Jordan Underhill on behalf of the State of Texas.

MS. PETERS:  Brittany Peters on behalf of the State of Texas.

MR. BONILLA:  Jonathan Bonilla for the State of Texas.

THE COURT:  All right.

MS. EGBU:  And Vivian Egbu, State of Texas.

THE COURT: All right.

MS. BADLAM: There's a couple more people on our side. Stefan Shropp is also for Defendant Pfizer, Ed Burbach for defendant Pfizer, and the esteemed Val Jones, who is on mute, also for defendant Pfizer.

THE COURT: Ms. Badlam, it's your motion for reconsideration.

MS. BADLAM: Yes, Your Honor.

THE COURT: And I have read the -- your case out of Houston, and so I'm aware of the facts and the rulings in that, and you can proceed.

MS. BADLAM: Thank you, Your Honor.

MR. JONES: Your Honor, --

MS. BADLAM: Go ahead.

MR. JONES: Your Honor, if I may, I just want to announce to the Court we also had some time set aside on the injunction matter that was pled, but the plaintiffs re -- amended their pleading and took the injunction out, so that's no longer an issue.

THE COURT: All right. That was a question that I had, and I'll get to that in a little bit then.

Ms. Badlam.

MS. BADLAM: Yes, Your Honor.

We have a PowerPoint presentation we're

going to put on the screen, if that's okay, to help facilitate the discussion.

THE COURT: That's fine.

MS. BADLAM: Great.

So, Your Honor, there's one question in front of the Court today, and the question is whether this Court will certify for interlocutory appeal the question of whether Section 360027C of the Texas Medicaid Fraud Prevention Act requires that the underlying conduct be material to the State's decision to pay.

Section 360027C, just to remind us all, says a person commits an unlawful act if the person knowingly makes or causes to be made a claim under a health care program for a product that has been adulterated, debased, mislabeled, or is otherwise inappropriate.

The standard for interlocutory appeal in Texas is that first there needs to be a controlling question of law as to which there is a substantial ground for difference of opinion and an immediate appeal from the order may materially advance the ultimate termination of the litigation.

The controlling question of law is whether Section 360027C requires materiality to prevent gotcha cases like this one plaintiffs have brought against

Pfizer and Tris.

This case is about current good manufacturing practice regulations. I know we talked about this extensively in our last hearing, Your Honor, the cGMP's, and there are many cGMP's, a number of which are technical foot falls.

But under the relevant statutory framework, which is the Federal Food, Drug, and Cosmetic Act, and also the Texas state equivalent, ethical foot falls can still render a product adulterated.

Now, plaintiff's position is that a violation of any one of these cGMP's, regardless of what the regulation is or the practical impact, renders the product adulterated and, thus, ineligible for Texas Medicaid reimbursement.

Under plaintiff's view, it does not matter whether the underlying conduct is material to the State's decision to pay for the drug. All that matters is the violation happened.

So the practical impact is that if a manufacturer violates the cGMP by failing, for example, to get a second signature on a lab report or a procedural document, that can violate a cGMP, and the product is adulterated, and a manufacturer will be in violation of the TMFPA if it doesn't stop seeking reimbursement, even

if the State Medicaid Board says we'll still continue to pay for it.

Defendant's position is that the conduct must be material, that adulteration as used in the statute means conduct that matters, conduct that is relevant to the State's decision to pay.

Your Honor, we aren't suggesting to add the word material. Rather, material is implicit in the term adulteration, so that the alleged cGMP violation cannot be one that has no impact to the Texas Medicaid Program's payment decision.

Does the violation of any cGMP regulation, no matter the practical effect, give rise to liability under the TMFPA, or does the adulteration need to be material to a payment decision?

This question is a controlling issue of law that deeply impacts the ongoing litigation, and the answer to this question takes us on two different paths.

Plaintiff's position is that the statute is a strict liability statute where any alleged cGMP violation can lead to liability under the TMFPA.

But the Texas Supreme Court in Malouf in June of last year ruled that the TMFPA is not intended to punish technical violations, but it is instead a powerful tool for targeting fraud against the Texas Medicaid

Program and that as a penal statute, the TMFPA must be strictly construed in favor of the defendant.

The Malouf case involved the interpretation of the word "and" in another provision of the TMFPA, and this term "and" is certainly more straightforward than the word adulteration.

But, Your Honor, the key takeaway from that case is that the TMFPA should not be read as a strict liability statute, which is defendant's position.

Our position is that conduct must be material, must involve something more than technical cGMP violations, because the TMFPA, as quoted in Malouf, is intended to play a crucial role in the State's ongoing efforts to deter, detect, and punish fraud, not to facilitate windfall recoveries based on technical violations that have not affected the State's payment decision.

Your Honor, because of course the State would keep paying for our product that patients need if it's just a technical foot fall, but would not pay for a product that is debased, defective, mislabeled, inappropriate in some way.

Now, Your Honor, you don't have to agree with us, and I think that's the key point here because today is about certifying for interlocutory appeal the

question and sending the case to the 15th Court of Appeals.

The 15th Court of Appeals, as you know, was created by the Texas legislature to have exclusive intermediate appellate jurisdiction over cases brought by or against the State; and in creating the court, Governor Abbott specifically said that the court was intended to serve a vital role to ensure that state statutes are applied uniformly throughout Texas and that businesses have a sophisticated and official process to resolve their disputes.

The decision on how to interpret the adulteration language and the statute will have lasting consequences for Texas and for the Medicaid program, and the 15th Court of Appeals is vested with the exclusive authority to resolve disagreements like this one, and there is substantial ground for disagreement on the controlling question of law.

As I've already talked about, the Texas Supreme Court's Malouf decision rejected the State's attempt to recover for technical violations with no practical effect on services or payment decisions, but that is what plaintiffs are trying to do in this case, advocating for an overbroad and incorrect reading so that any cGMP violation can lead to recovery, but that is not

the purpose of the statute, which is to combat fraud as specifically described by the Supreme Court.

And, of course, there is the recent Labcorp case, which plaintiffs say supports their position, but what Labcorp actually does is highlight that there is substantial ground for difference of opinion about whether provisions of the TMFPA require materiality, even when the provision doesn't have the word materiality.

In Labcorp, it dealt with a different provision of the TMFPA, but the trial court found materiality, even though the word wasn't there.  The 1st Court of Appeals disagreed, but, of course, the 1st Court of Appeals is not binding on this Court.

And, importantly, the 15th Court of Appeals that we just talked about had not yet been created when that decision was appealed, and the 15th Court of Appeals is the court that needs to weigh in on this issue.

The question concerning 360027C is an issue of first impression, but one that has far reaching implications.  The State is increasingly using the TMFPA for gotcha cases, and this issue will continue to surface.

So on the final point on whether the

appeal may materially advance the ultimate termination of the litigation, on this question there is no doubt that clarity on the adulteration provision advances the litigation.

I'm going to turn the floor over to counsel for Tris and Mehta in a second, and they will talk about the fact that this cause of action is the only cause of action against Tris and Mehta.

For Pfizer, a reading on this issue drastically alters the outcome of this litigation and could terminate the entire litigation or, at the very least, prevent the entire case from being re-litigated.

The adulteration claim is the foundation for the other three claims. All four of them turn on alleged cGMP violations and whether those violations need to be more than technical violations of cGMP regulations, and violations that are material to a payment decision is critical to the entire case. It will impact discovery, expert witnesses, summary judgment, pretrial instructions, trial, all of it.

If defendants are forced to proceed without clarity, a post-judgment appeal on this issue could require re-litigating the entire case from scratch because a strict liability case is very different than a fraud case.

In sum, Your Honor, we meet all of the requirements for you to certify this matter of interlocutory appeal, and I'm going to go ahead and turn the floor over to Tris.

MR. HOWELL: Thank you, Samantha.

Your Honor, I would just like to add without belaboring the point that the State has alleged four causes of action in its petition. Only one of those causes of action is against Tris or -- or its CEO Mr. Mehta.

And just as a side note, the argument that we are presenting today is on behalf of Tris. Mr. Mehta still has an appeal pending before the 15th Court of Appeals, and that was the Court's denial of his motion to dismiss for lack of personal jurisdiction, so, technically, we are here today, Your Honor, only on behalf of Tris.

But the point remains the same as to both Tris and Mr. Mehta, that if the Court permits the 15th Court of Appeals to resolve this controlling question of law and the 15th Court of Appeals holds, as we think that it will, that materiality is a required threshold for Section 360027C, that could be case dispositive for at least two of the named defendants in this case, Tris and -- and Pfizer.

So -- so that's all I have. I reserved time for the end for questions or rebuttal, if that's okay with the Court.

THE COURT: Fine.

Mr. Brown, are you arguing?

MR. BROWN: No, I'm not. I believe Mr. Bonilla will be arguing or somebody else from the AG's office. I apologize. Thank you.

THE COURT: All right.

MR. UNDERHILL: I -- I'll actually be arguing on behalf of the State of Texas, Your Honor.

THE COURT: Okay, Mr. Underhill.

MR. UNDERHILL: Yes.

So, you know, to begin with, I do want to refocus the discussion to Rule 168, because that's really what this hearing is on, whether or not this Court will amend its prior orders to allow for a permissive appeal, and so I want to focus on some of the language of 168 and just to draw it to the Court's attention.

First I want to mention that Rule 168 uses the word "may" in two important places. It says, A trial court may permit an appeal from an interlocutory order that is not otherwise appealable, and, second, later in the rule it says, A previously order -- issued order may be amended to include such permission.

So the reason I say that is because there are these two factors that need to be met for the appeal -- for the order to be amended, but even if those two factors are met, this Court has full discretion to deny that appeal.

So another way to read the rule is that a court may only permit the permissive appeal if these two factors are met that need to be outlined in the order. And so I want to go through those two factors and discuss them in a bit more detail.

The first of which is that there is a controlling question of law as to which there is substantial ground for difference of opinion.

And, you know, the first thing I'll say about this is that it's my understanding of the rule that simply being on opposing sides of an issue isn't enough to meet this threshold that there's substantial ground for a difference of opinion, right?

This is litigation. We're obviously going to take opposing views on many issues, but this Court is more than capable of resolving those disagreements, and an appellate court doesn't always need to weigh in when we disagree.

You know, what would meet the threshold, perhaps, is if this is a novel issue, an issue of first

impression, something that there's very little or no authority on that the Court, you know, wants to get appellate help on.

And so, of course, defendants argue that this is a novel issue. It's an issue of first impression, and that we really need the 15th Court to weigh in on it, and, you know, what I'd say in that regard is that that's simply not true.

You know, the way they frame the issue is that this is a question of whether materiality is required under 36.0027C and that no court has ruled on this specific provision and the question of whether or not materiality is required.

And, you know, that's trivially true, you know, just as you could say that about many of the different provisions under the THFPA (sic) and many of the provisions of various statutes. Courts simply have not ruled on all of the available laws in Texas; right?

But that's really not what this case is about and what this question is about. What this is really about is the question of statutory interpretation and statutory construction and specifically how courts should read statutes and, more specifically, that courts should not rewrite statute -- rewrite statutes or alter them in a way opposite of legislative intent.

And on that particular matter, there's certainly a wealth of authority about how courts should read statutes and specifically that they should look to the plain and common meaning of the text and that a statute is unambiguous.

You know, we should not use extrinsic aids or rules of construction to essentially change the meaning of the statute or introduce ambiguity, and that's really the State's position here is this -- the text of 36.0027C is not at all ambiguous.

If we look at the specific language, the word material is defined in the THFPA. There is a definition for it, and it appears in at least three of the unlawful acts that are enumerated under 36.002. You know, there are several unlawful acts. Material appears in a few of them and not in several others.

And 36.0027C is one of those acts that it does not appear in, and that was clearly a deliberate decision by the legislature. If they wanted to include materiality, they very clearly could have included that word in the text.

And this is really where the State v Labcorp case is helpful, you know, and just to talk -- I know you've read that case, but just to talk a little bit more about it, obviously it wasn't on permissive appeal,

so it has nothing to say about Rule 168.

But where it is helpful is on the actual substantive arguments the defendants are making regarding reading materiality into the text of the statute where it's not explicitly written, and that case dealt with another provision of the THFPA 36.022 where the defendant Labcorp argued even though materiality didn't appear in the text of section two that the Court should read it into, you know, the provision.

And the trial court agreed with defendant, and then on appeal, obviously the appellate court unanimously overturned the trial court, and I think some of the language they used is very helpful because it's completely in line with our position.

They say the word material does not appear in the text of Section 36.022. At the same time, the legislature included the word material in the provisions for three other unlawful acts in Section 36.002.

The statutory construction requires us to study the language of the specific provision at issue within the context of the statute as a whole and agreed to give a fact to every word, clause, and sentence.

And later on they say, you know, the fact that material was used in certain sections and omitted from other sections demonstrates the legislature's choice

not to impose a material -- materiality requirement in the admission provision, which is what they used to refer to 36.022.

And that's exactly our position here. The Labcorp case was decided in the wake of Malouf. It references Malouf, so Malouf did not change the rules of statutory construction. Really what Malouf was about was how to interpret a statute that is ambiguous in certain ways.

The Malouf case was not rewriting any of these rules. It was simply applying an existing rule, the rule of lenity, to a portion of the THFPA, which is not at issue here today, that was ambiguous in a certain way, and the Court, you know, strictly construed that section in such a way to the benefit of the defendant in the Malouf case.

But, again, it's our position here and has been consistently our position that 7C is not ambiguous in any way, it's not unclear, and so the Court, this Court, any Court, should simply look to the plain text of the statute and read it as it's written, and that's exactly what Labcorp says.

So just to bring this all around why we believe there's not substantial ground for a difference of opinion is that this isn't a novel issue. This is

simply an issue of statutory interpretation, which there is plenty of authority on.

And, you know, just to say a little bit more about that, I think it's worth looking at all of the language of 36.0027 because this section enumerates three different unlawful acts. There's A, B, and C, and obviously our claim is only under C.

But the word material does not appear anywhere in section seven, so, you know, maybe defendants could make the argument if it appeared somewhere it might be ambiguous what that word modifies or how it applies to the three relevant sections, but it simply is not there. It's omitted, period.

What does appear in 36.0027 is the word knowingly, which modifies both A, B, and C. So contrary to, you know, what defendant said, this isn't a strict liability provision. It requires that defendants acted knowingly in distributing the adulterated drug, and we certainly don't contest that.

You know, moving forward, I'll go ahead and talk about the second requirement that this materially advances the ultimate termination of litigation.

You know, first, as counsel for Tris mentioned, we only assert the 7C claim against Tris, and

so they make this argument that this could kick out Tris and Ketan Mehta potentially if this went up on appeal and if the appellate court ultimately decided to rewrite the statute in a way that benefited defendants.

We certainly don't agree with that. You know, the reason we did not plead materiality in regards to the 7C claim is because the plain text of the statute does not require us to do so, so we did not do something we're not required to.

That doesn't mean we couldn't plead materiality if an appellate court decided, no, you know, we're going to rewrite this statute in a way that requires materiality, so we certainly don't agree with the idea that this would just automatically kick out Tris and Mehta.

And then Pfizer specifically makes another argument that, you know, we assert three other claims against Pfizer under 36.021, two, and 4B, and they make this argument that our cause of action under 7C basically is the foundation of these other three claims, and we certainly disagree with that.

So what I mean by that is the decision regarding whether or not materiality is required by 7C certainly would not affect our other three independent claims against Pfizer.

And, you know, I think it's worth pointing out here, too, that 36.021 and 4B already -- they -- they're two of the unlawful provisions that actually use the word material and require us to, you know, demonstrate materiality, and we certainly don't contest that, and the 36.022 was the provision that was the subject of the Labcorp case, which does not require materiality.

So, you know, as far as advancing this case towards, you know, some end in regards to Pfizer, we don't agree that a change to 7C by an appellate court would affect, you know, any of our other claims against Pfizer in a way that would make this case resolve quicker.

You know, I think ultimately what this comes down to is that, you know, defendants want some court to rewrite the text of this provision in a way that benefits them.

You know, I certainly don't blame them for making that argument, but it's our position that any court should read the text solely as it's written without inserting an element that is defined in the statute, but not included in the actual text of this provision.

So we don't agree that this is a novel issue or an issue of first impression. You know, this is

certainly an issue that there's ample authority on and which this Court is more than capable of ruling on as it has already done two times, and so with that in mind, we respectfully ask that the Court deny this motion.

Thank you, Your Honor.

THE COURT: Mr. Underhill, I mean, that -- that's been my primary -- well, I wouldn't say primary. It was one of my concerns with regard to the -- when I issued the initial order in this, and I think that got confirmed by the fact that the -- there was a motion for summary judgment. I thought this -- I didn't think it would completely resolve everything.

You're telling me even if the Court -- if the 15th Court says materiality is required that this -- that I'm still going to have issues that I have to resolve in this case; is that --

MR. UNDERHILL: That's correct.

THE COURT: Okay. I thought after the motion for summary judgment, beyond that, so with the injunction out of the question, there are still issues beyond that, and that --

MR. UNDERHILL: Yes, that's correct. You know, the motion for summary judgment that defendants submitted -- well, that Pfizer submitted was related to a very small portion of the case, only related to

injunctive relief.

It wasn't related to the actual other four claims we assert against Pfizer, and we amended our petition to take out the injunctive relief we originally asked for against Pfizer, so that issue is mooted.

MS. BADLAM: And, Your Honor, we would, of course, argue that it does -- it can potentially terminate the litigation because whether or not materiality is required is so critical, and the State has not pled materiality, which they actually just admitted that they did not plead materiality.

And our position is that they cannot plead materiality because the State continued to pay for the drug even after the State knew -- the State Medicaid Board knew about the alleged cGMP violations. So, I mean, relevant to the payment decision, we -- we would allege that they cannot show that.

And, Your Honor, I do -- I do just want to highlight a couple of things really quickly. The fact that the State highlighted the entire -- the entire provision of the TMFPA to look at the conduct, all of the conduct in that provision is conduct that is material to the State's payment decision.

Not -- not providing services that were allegedly rendered, defective services. The whole thing

is about serious conduct where it's the term adulteration.

We're not saying to add the word material, but what does the term adulteration mean in the context of the statute? Does it really mean that every single cGMP violation like missing a signature renders the product ineligible for reimbursement? That is the question.

Where in Malouf it was about a construction of "and," the State said the term "and," right, was ambiguous, but we're saying adulteration is ambiguous, what it means in the statute when you look at the entire -- the entire context.

And knowingly doesn't fix it because knowingly just means that if we were to know that we had -- were missing a signature and we got a 483 from FDA that said, nope, you've violated this reg, so you've adulterated the product, that means that technically wouldn't be able to submit the product for reimbursement in -- in Texas or be in violation of the TMFPA.

So the knowingly doesn't fix the problem of the strict liability interpretation that the State is taking, which is contrary to Malouf. Malouf is the ground-breaking decision here that happened after you -- you gave your opinion.

You don't have to agree with us. That's not it at all. It's just that there is a substantial difference of opinion, and it does materially advance litigation.

MR. HOWELL: Your Honor, if I could add just -- just two additional points to that.

I mean, there's -- there's over 60 cGMP's that apply to -- to pharmaceutical manufacturers like Tris, and even the FDA's website says that if a pharmaceutical manufacturer is in violation or not in compliance with a cGMP, that does not necessarily mean that the product is unsafe. I mean, that's from the FDA's public website.

So -- so whether there is a -- whether it's material -- whether the violation of the cGMP is material is an issue that needs to be resolved by the 15th Court of Appeals.

And we've taken the liberty, Your Honor, of preparing an order -- a proposed amended order that we plan to submit to the Court immediately after this hearing that tracks the language and the requirements of Section -- of Rule 168, as well as Texas Civil Practices and Remedies Code Section 54014D, that if -- if the Court considers and is willing to sign will tee the issue up for the 15th Court of Appeals, which, as we've already

pointed out, has exclusive intermediate appellate jurisdiction over this case.

THE COURT: On the issue of payment, I thought that the Court of Appeals in Houston took care of that issue, or at least addressed it, you know, the fact the State continued paying wouldn't be a -- some sort of waiver of the right to make this claim, so, I mean, it's -- I mean, I don't know if that argument seems to go anywhere here.

Mr. Underhill?

MR. UNDERHILL: Yeah. And can I just say something --

THE COURT: Yes.

MR. UNDERHILL: -- additional regarding materiality?

Because, you know, defendants keep saying that this has to deal with the State's payment, and I think they're operating under the way material is defined under the False Claims Act, which I'll just read so you see how that definition differs from the definition in the THFPA.

So the False Claims Act defines material as having a natural tendency to influence or be capable of influencing the payment or receipt of money or property.

Now, the definition of THFPA is actually different. It says material means having a natural tendency to influence or be capable of influencing, period, and that's it.

So it's not just about the payment of money, as, you know, the False Claims Act clearly restricts materiality to dealing with the payment of receipt of money, but that's not all that's at stake with the way that material is defined in the THFPA, so I think it's incorrect for defendants to focus solely on that.

But as you said, you know, it's not dispositive anyway whether or not the payment -- or the State continued to pay, as, you know, you mentioned the Court in the Labcorp case already addressed.

MS. BADLAM: I think that's a great point, that it's actually the conduct itself can actually influence, right?

Take the payment part out of it. The way that you read it is the perfect way to sum it -- sum it up, that the conduct itself can actually influence the State in some way, and that's what we're saying has to be a part of the actual case.

And as you said -- as was said by plaintiffs, it -- it wasn't pled. That has not been pled, and they don't think they have to plead it. They

don't think they have to show this at all at trial.

So it's such a vastly different case if this is interpreted to mean that any type of cGMP violation can render a product adulterated, even if it doesn't influence the State Medicaid Board.

MR. UNDERHILL:  And, Your Honor, can I -- sorry.  Can I just respond to that quickly?

THE COURT:  Yes.

MR. UNDERHILL:  So it's not true that we don't plead materiality.  As I mentioned in my argument, we assert four different claims against Pfizer.  Two of those claims, 36.0021 and 4B, require us to plead materiality, and so we did.

So it's simply not true that we are saying, oh, we don't have to plead materiality at all, it doesn't apply, period.  No, we're simply saying that 7C does not requires us to plead materiality.  These other claims do, and so we have, and we recognize that we have to demonstrate materiality on those specific claims at trial.

THE COURT:  Do you agree with Mr. Howell, though, if materiality is an issue, or if the Court determined that, that his client would, in fact, be out, but you would still have your claims against Pfizer?

MR. UNDERHILL:  I don't agree with that,

you know, because I think like our position is that requiring materiality under 7C would essentially be rewriting the statute, right, to insert this word material.

And so in the unlikely case that that happened, that an appellate court did that, you know, it's my position that -- or the State's position that we could replead our claims against Tris and potentially keep Mehta, assuming he stays in the case, to include materiality.

THE COURT: All right. All right. Counsel, I appreciate your arguments. If you'll get me your orders, I plan on having you a ruling by Wednesday.

MS. BADLAM: Thank you, Your Honor.

MR. UNDERHILL: Thank you, Your Honor.

THE COURT: Thank you for your time. You'll be excused.

(Hearing adjourned.)

STATE OF TEXAS          )

COUNTY OF HARRISON    )

I, Tammy L. Goolsby, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this 18th day of February, 2025.

**/s/ TAMMY GOOLSBY**_____
Tammy L. Goolsby, CSR
Texas CSR 3101, Expires 7/31/25
Official Court Reporter
71st Judicial District Court
200 W. Houston, Suite 219
Marshall, Texas  75670
Telephone 903-935-8407

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98283633
Filing Code Description: Response
Filing Description: Plaintiffs' Response to Defendants' Petition for Permission to Appeal with Appendix
Status as of 3/11/2025 7:04 AM CST

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Jonathan Bonilla | 24073939 | Jonathan.Bonilla@oag.texas.gov | 3/10/2025 4:49:44 PM | SENT |
| Jordan Underhill | 24102586 | jordan.underhill@oag.texas.gov | 3/10/2025 4:49:44 PM | SENT |
| Nadia Burns | 24041176 | nadia.burns@oag.texas.gov | 3/10/2025 4:49:44 PM | SENT |
| Vivian Egbu | | vivian.egbu@oag.texas.gov | 3/10/2025 4:49:44 PM | SENT |

Associated Case Party: Tarik Ahmed

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Earl Thames | 785097 | Glennthames@potterminton.com | 3/10/2025 4:49:44 PM | SENT |
| Patrick S.Almonrode | | patalmonrode@jtblawgroup.com | 3/10/2025 4:49:44 PM | SENT |
| Jason T.Brown | | jtb@jtblawgroup.com | 3/10/2025 4:49:44 PM | SENT |
| Michael E.Jones | | mikejones@potterminton.com | 3/10/2025 4:49:44 PM | SENT |

Associated Case Party: Tris Pharma Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Harry Gillam | 7921800 | gil@gillamsmithlaw.com | 3/10/2025 4:49:44 PM | SENT |
| Andrew Gorham | 24012715 | tom@gillamsmithlaw.com | 3/10/2025 4:49:44 PM | SENT |
| William E.Lawler, III | | william.lawler@blankrome.com | 3/10/2025 4:49:44 PM | SENT |
| Bobbye Pyke | | Bobbye.Pyke@blankrome.com | 3/10/2025 4:49:44 PM | SENT |
| Huaou Yan | | huaou.yan@blankrome.com | 3/10/2025 4:49:44 PM | SENT |

Associated Case Party: Pfizer Inc.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98283633
Filing Code Description: Response
Filing Description: Plaintiffs' Response to Defendants' Petition for Permission to Appeal with Appendix
Status as of 3/11/2025 7:04 AM CST

Associated Case Party: Pfizer Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stefan Schropp | | stefan.schropp@ropesgray.com | 3/10/2025 4:49:44 PM | SENT |
| Samantha BarrettBadlam | | samantha.badlam@ropesgray.com | 3/10/2025 4:49:44 PM | SENT |
| Edward Burbach | | eburbach@foley.com | 3/10/2025 4:49:44 PM | SENT |
| George Valton | | val@valjoneslaw.com | 3/10/2025 4:49:44 PM | SENT |